STATE of Wisconsin,
Plaintiff-Respondent-Petitioner,

v.

Nathaniel L. SUMNER, Defendant-Appellant.

Supreme Court

*No. 2006AP102–CR. Oral argument December 11, 2007.
—Decided July 15, 2008.*

2008 WI 94

(Also reported in 752 N.W.2d 783.)

For the plaintiff-respondent-petitioner the cause was argued by *Stephen W. Kleinmaier*, assistant attorney general, with whom on the briefs was *J.B. Van Hollen*, attorney general.

For the defendant-appellant there were briefs by *Craig W. Albee, Carol S. Josten,* and *Glynn, Fitzgerald & Albee, S.C.*, Milwaukee, and oral argument by *Craig W. Albee.*

¶ 1. DAVID T. PROSSER, J. This is a review of an unpublished decision of the court of appeals,[1] which reversed a judgment of the Milwaukee County Circuit Court, William Sosnay, Judge. The circuit court denied Nathaniel Sumner's (Sumner) motion to suppress evidence obtained during a protective frisk following a traffic stop, and he subsequently pled guilty to possession of heroin, a violation of Wis. Stat. §§ 961.14(3)(k) and 961.41(3g)(am).[2]

¶ 2. The State appeals the court of appeals' decision reversing the circuit court's denial of Sumner's motion to suppress and his subsequent judgment of conviction. The court of appeals reviewed the totality of the circumstances surrounding Deputy Timothy Johnson's protective frisk of Sumner and concluded that Johnson did not have the requisite reasonable suspicion that Sumner was armed and dangerous to

---

[1] *State v. Sumner*, No. 2006AP102–CR, unpublished slip op., (Wis. Ct. App. Oct. 19, 2006).

[2] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise indicated.

conduct a protective frisk. *State v. Sumner,* No. 2006AP102–CR, unpublished slip op., ¶¶ 1, 11 (Wis. Ct. App. Oct. 19, 2006). The court of appeals also addressed the legality of a search of Sumner's vehicle and concluded that the search was illegal. *Id.,* ¶ 11 n.5.

¶ 3. We are presented with two issues: (1) whether Johnson had the requisite reasonable suspicion necessary to conduct a protective frisk of Sumner; and (2) whether the court of appeals should have addressed the legality of the search of Sumner's vehicle.

¶ 4. We conclude that the protective frisk of Sumner was justified by specific, articulable facts supporting a reasonable suspicion that Sumner was armed and dangerous. With regard to the search of Sumner's vehicle, we conclude that it was not necessary for the court of appeals to address this issue because the vehicle search played no part in Sumner's conviction. Accordingly, we reverse the court of appeals.

## I. BACKGROUND

¶ 5. The following facts are taken from the August 3, 2005, hearing on Sumner's motion to suppress.[3] Around 9 p.m. on July 29, 2004, Milwaukee County Sheriff's Deputies Timothy Johnson and Kevin Johnson[4] were on patrol in a marked Chevrolet Tahoe police vehicle (squad) traveling east on Locust Street near 21st Street in the City of Milwaukee. Locust Street is a two-lane, undivided street with lanes going east and

---

[3] Two witnesses testified at the hearing: Deputy Timothy Johnson and Nathaniel Sumner.

[4] Deputies Timothy Johnson and Kevin Johnson are brothers and patrol partners. For the sake of clarity, we will refer to Deputy Timothy Johnson as "Johnson" and to Deputy Kevin Johnson as "Kevin Johnson."

west. Johnson's squad was stopped and waiting for cars in front of it to turn right when a red BMW (vehicle) passed the squad on the left. The vehicle's driver waved to the squad and crossed into the oncoming westbound lane of traffic. The vehicle, driven by Sumner with no other occupants, forced cars in the oncoming lane to stop and pull over to their right to avoid a collision.

¶ 6. Johnson activated his emergency lights and stopped the vehicle in front of 1823 West Locust Street, approximately two blocks east of the 21st Street intersection. As the BMW was pulling over, Johnson observed the driver making reaching gestures toward the passenger side of the vehicle. Johnson mentioned these gestures to Kevin Johnson and notified police dispatch of the squad's location. Johnson then approached the vehicle and asked Sumner for his driver's license or an identification card. Sumner stated that he did not have either. Johnson then asked him for his name and other information to fill out a field interview card. Sumner told Johnson his name and date of birth. He was unable to give Johnson a street address.

¶ 7. Johnson observed that Sumner's vehicle was filled with objects, including office equipment, clothing, a vacuum, and bags. Citing Sumner's reaching gestures, lack of identification, and the amount of items in the vehicle, Johnson asked Sumner if he could search the vehicle. Sumner said no. Johnson again asked whether he could search the vehicle.[5] Sumner again declined. As Johnson returned to the squad, Sumner asked if he could "hurry up."

---

[5] Johnson testified: "I informed him that I would like to search the vehicle for my safety due to his gestures to the passenger side area and there w[ere] a lot of things in his vehicle which I thought he could have been hiding a weapon at that point."

¶ 8. Johnson told Kevin Johnson that he would keep an eye on Sumner because of his movements while Kevin Johnson ran Sumner's name through the squad's computer system. Kevin Johnson ran Sumner's name while Johnson monitored Sumner's activity. A computer check showed that Sumner's license was suspended, a fact he had not revealed to Johnson. The deputies called for a tow truck, and Kevin Johnson began writing Sumner a citation for operating while suspended. Johnson did not feel that it was necessary to have Sumner exit his vehicle while his driver's license was checked and the citation written, as he kept Sumner under surveillance.

¶ 9. After about 15 minutes, the deputies exited the squad and approached the rear of Sumner's vehicle. Johnson did not see Sumner do anything suspicious during the 15–minute wait. The deputies asked Sumner to step out of the vehicle so that they could get a fingerprint for identification purposes. Sumner exited and moved to the rear of the vehicle. The deputies told Sumner his driver's license was suspended, his vehicle would be towed because of his suspended license, and he would be walking home, as it was sheriff's department policy to tow a vehicle when the driver's license is determined to be suspended. Kevin Johnson then commenced a search of the vehicle. Johnson testified:

> At that point I was in the rear of his vehicle and Mr. Sumner was sweating. Kept going in his pockets. I told him to keep his hands out of his pockets at which point he again went into his pockets and at that time I thought with his gestures in the vehicle and his demeanor outside the vehicle, I asked if I could pat him down.

¶ 10. When asked by the prosecutor what observations he made that led him to frisk Sumner, Johnson testified:

By him continuously going in his pockets. I told him to keep his hands out of his pockets. His demeanor was—He appeared very nervous by him continuously going in his pockets and me telling him to keep his hands out of his pockets. At that point I believe it was the second or third time I told him to keep his hands out, that's when I said, okay, I'm going to do a pat down for my safety.

¶ 11. With respect to Sumner's sweating, Sumner testified that "[i]t was very hot." But, when asked on cross-examination if he wasn't sweating because he was "nervous regarding the items that [he] had on [his] person and that were in the car," Sumner replied: "I suppose it was partly that, yes."

¶ 12. Sumner complied with Johnson's request for a pat down search, turned away from Johnson, and put his arms out at his sides and parallel to the ground. Sumner was wearing a t-shirt and either "sweat pants" or "running pants" with front and rear pockets. Johnson performed a protective frisk of Sumner, starting at the top of his body and working down. When Johnson reached the waistband area, he felt a lump in Sumner's right rear pocket. Johnson asked Sumner what the lump was, and Sumner stated that it was just a napkin. According to Johnson's testimony, Sumner removed the napkin from his pocket and placed it on the vehicle's trunk.[6]

¶ 13. Johnson returned to frisking the front of Sumner's waistband, and two small bindles fell to the ground from Sumner's pants leg. Johnson questioned Sumner about the bindles, and Sumner stated that they contained heroin. At that point, Johnson arrested Sum-

---

[6] Sumner testified that Johnson reached into Sumner's pocket and removed the napkin himself. This dispute will be discussed below in section III. B. of this opinion.

ner, put him in handcuffs, and then opened the napkin that had been placed on the trunk. Johnson found three additional bindles of heroin in the napkin. Johnson also assisted Kevin Johnson in the search of Sumner's vehicle. Their search revealed multiple syringes, a rubber tourniquet, and cooking caps.[7]

¶ 14. On August 1, 2004, Sumner was charged with one count of possession of heroin in violation of Wis. Stat. § 961.14(3)(k) and 961.41(3g)(am). He moved to suppress the evidence obtained during the traffic stop as illegally obtained. The circuit court held a hearing and denied Sumner's motion. Sumner then pled guilty to possession of heroin, and a judgment of conviction was entered. Sumner appealed.

¶ 15. On October 19, 2006, the court of appeals reversed and remanded. *Sumner*, No. 2006AP102–CR, unpublished slip op., ¶ 28. The court determined that based on the totality of circumstances Johnson did not have a reasonable suspicion that Sumner was armed and dangerous when he conducted a protective frisk for weapons. *Id.* The court of appeals emphasized that "the lapse of time between the stop and the frisk mitigated any reasonable suspicion of danger" and that "[a]n objectively reasonable officer would not leave an occupant of the vehicle who was believed to be armed and dangerous unattended for fifteen minutes." *Id.* (citing *State v. Mohr*, 2000 WI App 111, 235 Wis. 2d 220, 613 N.W.2d 186). The court of appeals further concluded that because Johnson lacked a reasonable suspicion to frisk Sumner, the deputies also lacked a reasonable suspicion to search Sumner's vehicle. *Id.*, ¶ 11 n.5.

---

[7] In its findings of fact and conclusions of law, the circuit court found "that it is common practice as it was here and the court does not find specifically that it was unreasonable that prior to the tow that the vehicle be searched."

¶ 16. The State petitioned this court for review, which we granted on June 12, 2007.

## II. STANDARD OF REVIEW

¶ 17. In reviewing a motion to suppress, this court employs a two-step analysis. *State v. Dubose*, 2005 WI 126, ¶ 16, 285 Wis. 2d 143, 699 N.W.2d 582. First, we will uphold the circuit court's findings of fact unless they are clearly erroneous. *Id.* Second, we review de novo whether those facts constitute reasonable suspicion. *Id.*

## III. ANALYSIS

¶ 18. We will first analyze whether Johnson possessed the requisite reasonable suspicion to frisk Sumner. Next, we will analyze a dispute regarding the circuit court's findings of fact regarding that frisk. Finally, we will address whether the court of appeals should have decided the legality of the search of Sumner's vehicle.

### A. Reasonable Suspicion

¶ 19. The Fourth Amendment to the United States Constitution[8] and Article I, Section 11 of the Wisconsin Constitution[9] prohibit unreasonable governmental searches. *State v. Johnson*, 2007 WI 32, ¶ 20,

---

[8] In relevant part, the Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.

[9] In relevant part, Article I, Section 11 states: "The right of the people to be secure in their persons, houses, papers, and

299 Wis. 2d 675, 729 N.W.2d 182. This court ordinarily construes the protections of these constitutional provisions coextensively. *Id.*

██

¶ 20. The Fourth Amendment's touchstone is reasonableness, which is measured in objective terms by examining the totality of the circumstances, eschewing bright-line rules and emphasizing instead the fact-specific nature of the reasonableness inquiry. *Ohio v. Robinette,* 519 U.S. 33, 34 (1996). A determination of the reasonableness of the search must balance "the government's need to conduct the search against the invasion the search entails." *State v. McGill,* 2000 WI 38, ¶ 18, 234 Wis. 2d 560, 609 N.W.2d 795 (citing *Terry v. Ohio,* 392 U.S. 1, 21 (1968)).

██

¶ 21. "During an investigative stop, an officer is authorized to conduct a [protective] search[10] of the outer clothing of a person to determine whether the person is armed if the officer is 'able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' " *Johnson,* 299 Wis. 2d 675, ¶ 21 (quoting *Terry,* 392 U.S. at 21). The purpose of a protective search is "to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *State v. Kyles,* 2004 WI 15, ¶ 9, 269

effects against unreasonable searches and seizures shall not be violated." Wis. Const. art. I, § 11.

[10] The terms "protective search," "pat-down," and "frisk" are commonly used to refer to the protective measure endorsed by *Terry v. Ohio,* 392 U.S. 1 (1968). *See generally* Thomas K. Clancy, *Protective Searches, Pat-Downs, or Frisks?: The Scope of the Permissible Intrusion to Ascertain if a Detained Person is Armed,* 82 Marq. L. Rev. 491 (1999).

Wis. 2d 1, 675 N.W.2d 449 (quoting *Terry,* 392 U.S. at 24). In evaluating a search, "due weight must be given, not to [the officer's] inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id.* (quoting *Terry,* 392 U.S. at 27); *Bies v. State,* 76 Wis. 2d 457, 466, 251 N.W.2d 461 (1977) (same).

¶ 22. "The reasonableness of a protective search for weapons is an objective standard ... whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety and that of others was in danger because the individual may be armed with a weapon and dangerous." *Kyles,* 269 Wis. 2d 1, ¶ 10 (citation and internal marks quotation omitted).[11] "In determining whether a frisk was reasonable, a court may look 'to any fact in the record, as long

[11] We have previously noted that this standard of objective reasonableness has been codified in Wis. Stat. § 968.25, which is construed in light of *Terry* and its progeny. *State v. Johnson,* 2007 WI 32, ¶ 22 n.8, 299 Wis. 2d 675, 729 N.W.2d 182. Wis. Stat. § 968.25 provides in full:

> Search during temporary questioning. When a law enforcement officer has stopped a person for temporary questioning pursuant to s. 968.24 and reasonably suspects that he or she or another is in danger of physical injury, the law enforcement officer may search such person for weapons or any instrument or article or substance readily capable of causing physical injury and of a sort not ordinarily carried in public places by law abiding persons. If the law enforcement officer finds such a weapon or instrument, or any other property possession of which the law enforcement officer reasonably believes may constitute the commission of a crime, or which may constitute a threat to his or her safety, the law enforcement officer may take it and keep it until the completion of the questioning, at which time the law enforcement officer shall either return it, if lawfully possessed, or arrest the person so questioned.

as it was known to the officer at the time he conducted the frisk and is otherwise supported by his testimony at the suppression hearing.' " *Id.* (quoting *McGill,* 234 Wis. 2d 560, ¶ 24). Circuit courts must determine whether a frisk was reasonable on a case-by-case basis, evaluating the totality of circumstances. *Johnson,* 299 Wis. 2d 675, ¶ 22; *Kyles,* 269 Wis. 2d 1, ¶ 49.

■

¶ 23.. Our protective search or "frisk" jurisprudence has consistently emphasized that the totality of all circumstances present and known to the officer must be taken into account to assess the legality of the procedure. Naturally, some factors will be of greater import than others in the reasonable suspicion calculus in a particular case. Our cases, most notably *Kyles,* have first broken down the reasonable suspicion issue into an analysis of each primary factor present and then concluded by viewing these primary factors in the totality of circumstances. *See id.,* ¶¶ 17–18, 68–72 (listing "six factors that compose the totality of the circumstances" in that case, and then evaluating them in their totality). The court of appeals followed this methodology. *Sumner,* No. 2006AP102–CR, unpublished slip op., ¶¶ 11, 26–28 (noting that the court "examine[d] each of the key factors . . . separately and then in their entirety"). This is the most logical approach for a court evaluating reasonable suspicion because the standard set forth in *Terry* requires specificity: "[I]n justifying the particular intrusion the police officer must be able to point to *specific* and *articulable* facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry,* 392 U.S. at 21 (emphasis added). Therefore, we first list the factors relied upon by the State to indicate Johnson's reasonable suspicion to search.

¶ 24. The State's brief lists four factors to evaluate reasonable suspicion:

1. Johnson saw Sumner reaching to the passenger side of the vehicle (reaching gestures);

2. Johnson said Sumner was nervous;

3. Sumner repeatedly put his hands in his pockets; and

4. Johnson said he was concerned about his safety.

¶ 25. The State argues that the totality of circumstances, weighing the factors above and all other circumstances known to Johnson, indicate that Johnson had a reasonable suspicion that Sumner was armed and dangerous before he performed the protective search. We agree.

1. Sumner's Reaching Gestures

¶ 26. Johnson observed Sumner make reaching gestures toward the passenger side of the vehicle as Sumner was pulling over to stop. This observation aroused the deputy's suspicion that Sumner might be retrieving or hiding a weapon. An unexplained reaching movement or a furtive gesture by a suspect during a traffic stop can be a factor in causing an officer to have reasonable suspicion that a suspect is dangerous and has access to weapons. *See Johnson,* 299 Wis. 2d 675, ¶ 37.[12] The importance of a movement or gesture is

---

[12] Other courts have also noted furtive reaching gestures as indicative of grounds to conduct a protective search. *See United States v. Edmonds,* 240 F.3d 55, 61, (D.C. Cir. 2001) (recognizing that a furtive gesture made in response to the presence of police

influenced by its nature, its timing, and whether it can be explained either by the suspect or by the officer's subsequent observations.

can be a significant factor to support reasonable suspicion of criminal wrongdoing); *United States v. Green,* 465 F.2d 620, 623 (D.C. Cir. 1972) (holding that officers were justified in conducting a limited protective search when they stopped a car for a traffic violation and "observed the driver making furtive movements as though pulling something out of his belt and placing it under his seat"); *State v. Quinlan,* 921 A.2d 96, 108 (R.I. 2007) ("We are satisfied that the officers had reasonable suspicion to conduct a pat-down frisk for weapons after they had observed furtive and suspicious behavior [continuously reaching to the floor of a Jeep] and after the occupants repeatedly ignored orders to keep their hands where Officer Kerrigan could see them."); *State v. Kennedy,* 726 P.2d 445, 451 (Wash. 1986) ("[Officer] Adams saw a furtive gesture sufficient to give him an objective suspicion that Kennedy was secreting something under the front seat of the car. From his vantage, in his own car behind Kennedy's, he had no way of knowing what Kennedy was hiding. When he had Kennedy outside the car, he did not frisk him, as he could have had he suspected Kennedy might be armed. However, there remained the gesture, the unknown object under the front seat, and the passenger inside the car who had easy access to the object."); *State v. Dilyerd,* 467 So. 2d 301, 304–05 (Fla. 1985) (holding that a search for weapons was permissible when a car was illegally trespassing in an orange grove at night and the passenger leaned forward and appeared to do something with his hands on the floorboard of the car); *State v. Menezes,* 648 S.E.2d 741, 745 (Ga. Ct. App. 2007) ("Observation of what reasonably appear to be furtive gestures is a factor which may properly be taken into account in determining whether probable cause exists." (quotation omitted)); *State v. Sutherland,* 637 N.E.2d 366, 369 (Ohio Ct. App. 1994) (holding that the search of a vehicle's passenger compartment after a traffic stop was reasonable when an officer had viewed the defendant and a passenger making "furtive" movements in the vehicle that might have concealed a weapon).

¶ 27. With regard to Sumner's reaching gestures, two sub-issues are raised by the parties: Johnson's decision not to order Sumner out of the vehicle immediately upon approaching it after noting his reaching gestures; and the impact of the passage of time between Johnson seeing the reaching gestures when he stopped the vehicle and later frisking Sumner. The State argues that the court of appeals incorrectly concluded that any concern for safety aroused by Sumner's reaching gestures was mitigated by the passage of approximately 15 minutes between the gestures and Johnson's protective search. *Sumner*, No. 2006AP102–CR, unpublished slip op., ¶ 28. The State disagrees with the court of appeals' conclusion that "[a]n objectively reasonable officer would not leave an occupant of the vehicle who was believed to be armed and dangerous unattended for fifteen minutes." *Id.* The court of appeals relied on *Mohr* for this proposition and considered it "significant that the officer [in *Mohr*] had been on the scene and allowed Mohr to remain in the vehicle for twenty minutes while he dealt with the driver and another passenger." *Id.*, ¶ 21 (citing *Mohr*, 235 Wis. 2d 220, ¶ 16).

¶ 28. In *Mohr*, police stopped a vehicle with four passengers for a traffic violation on a January night at 1 a.m. *Mohr*, 235 Wis. 2d 220, ¶¶ 2–3. An officer approached the vehicle, asked the driver for identification, and noted the strong odor of intoxicants emanating from within. *Id.*, ¶ 3. The officer asked the driver to step out to perform a field sobriety test while the passengers remained in the vehicle. *Id.* The test revealed that the driver was not intoxicated, and the officer then asked the driver for permission to search the vehicle. *Id.*, ¶ 4. The driver consented to the vehicle search, and the passenger immediately behind the

driver was asked to step out of the vehicle for safety reasons. *Id.*, ¶¶ 4–5. Ten minutes had passed since the vehicle was pulled over. *Id.*, ¶ 16. The passenger, a minor, appeared intoxicated and was arrested for consumption of alcohol. *Id.*, ¶ 5. The driver and minor were placed in a squad car and monitored. *Id.*

¶ 29. After ten more minutes, the officer returned to the vehicle and asked the name of the front seat passenger, Mohr, and requested that he exit the vehicle for safety purposes. *Id.*, ¶¶ 6, 16. The officer noted that Mohr stumbled getting out of the vehicle and smelled strongly of intoxicants. *Id.*, ¶ 6. The officer asked Mohr to sit in a squad car, but he refused. *Id.* Mohr stated that he wanted to go home; the officer told him to wait until his identification was confirmed. *Id.* Because of the cold, the officer told Mohr to sit in the squad car. *Id.* Mohr put his hands in his pockets, became resistive, and acted nervous. *Id.*, ¶¶ 6–7. The officer requested that Mohr take his hands out of his pockets, but Mohr refused. *Id.*, ¶ 6. After he refused to remove his hands a second time, Mohr was handcuffed for officer safety. *Id.*, ¶ 7.

¶ 30. Four or five minutes later, the officer frisked Mohr and discovered a plastic baggie that contained marijuana. *Id.*, ¶ 8. Mohr was placed under arrest. *Id.*

¶ 31. The court of appeals held that the frisk of Mohr was not supported by reasonable suspicion because it occurred approximately 25 minutes after the initial traffic stop, and "the most natural conclusion is that the frisk was a general precautionary measure, not based on the conduct or attributes of Mohr." *Id.*, ¶ 15. The court of appeals concluded that the officer who frisked Mohr was apparently not concerned for his safety when he made the traffic stop because he did not order the passengers out of the vehicle and left the

vehicle unattended while spending 20 minutes with the driver and minor. *Id.*, ¶ 16.

¶ 32. In *Mohr* the defendant was a passenger in a car whose driver was given only a traffic warning. *Id.*, ¶ 4. The defendant was not suspected of any offense and wanted to leave the scene, alleging that his house was only two blocks away. *Id.*, ¶ 6. The officers did not permit Mohr to leave, and asked him to sit in a squad car. *Id.* When he refused and kept putting his hands in his pockets while standing outside at 1 a.m. on January 31, he was cuffed with his hands behind his back. *Id.*, ¶ 7. The arresting officer said Mohr had been nervous and resistive. *Id.* Several minutes later the officer conducted a pat-down search that uncovered marijuana in Mohr's jacket pocket. *Id.*, ¶ 8. It was in this context that the court of appeals pointed to "the fact that the frisk occurred approximately twenty-five minutes after the initial traffic stop" and concluded that the frisk was "a general precautionary measure," as opposed to a focused protective search. *Id.*, ¶ 15. Although there are some similarities between *Mohr* and this case, *Mohr* is distinguishable on the facts and does not stand for a rule that time necessarily diminishes suspicion or risk.

¶ 33. The State's brief points out that there is no golden rule regarding whether to order a suspect to stay in his vehicle or to step out during a traffic stop.[13] We agree. "[T]he millions of traffic stops that occur every

---

[13] The State has cited several cases from other jurisdictions and some police training manuals in its brief regarding the varied treatment of an officer's decision to order a stopped vehicle's driver and passengers to stay in or step out of the vehicle. We need not recount these authorities but recognize that each traffic stop will require a tailored response by law enforcement.

year are not fungible," hence the decision to order a suspect out of a car is not so universal that it is always necessary or even reasonable. *Pennsylvania v. Mimms,* 434 U.S. 106, 121 (1977) (Stevens, J., dissenting). We therefore disagree with the court of appeals' conclusion that "[a]n *objectively reasonable* officer would not leave an occupant of the vehicle who was believed to be armed and dangerous unattended for fifteen minutes." *Sumner,* No. 2006AP102–CR, unpublished slip op., ¶ 28 (emphasis added). Clearly, the myriad circumstances an officer might face in a traffic stop would suggest ordering passengers out of their vehicle in some cases but not in others.[14] We do not believe the facts of this case indicate that Johnson was objectively unreasonable in not ordering Sumner out of the vehicle immediately upon approaching it the first time. Two deputies were present at the scene, and Sumner was under constant surveillance.

¶ 34. The State conceded in its brief and at oral argument that Johnson did not possess the requisite reasonable suspicion necessary to perform a protective search immediately after observing Sumner's reaching gestures and after approaching his vehicle. *See*

---

[14] Justice John Paul Stevens wrote in *Pennsylvania v. Mimms,* 434 U.S. 106 (1977), that one cannot assume that "ordering the routine traffic offender out of his car significantly enhances the officer's safety." *Id.* at 119 (Stevens, J., dissenting). "Arguably, such an order could actually aggravate the officer's danger because the fear of a search might cause a serious offender to take desperate action that would be unnecessary if he remained in the vehicle while being ticketed." *Id.; see also Maryland v. Wilson,* 519 U.S. 408, 416–17 (1997) (Stevens, J., dissenting) (observing that statistics on officer traffic assaults do not conclusively indicate whether ordering persons out of a vehicle increases or decreases danger to police).

*Johnson,* 299 Wis. 2d 675, ¶ 43 (declining to adopt a per se rule that a single reaching gesture alone provides the reasonable suspicion necessary to conduct a protective frisk). Consequently, we are puzzled by the court of appeals' conclusion that "[a] reasonable officer would have ordered Sumner out of the vehicle and performed a frisk if there was a serious safety concern." *Sumner,* No. 2006AP102–CR, unpublished slip op., ¶ 22. Because Johnson did not possess the requisite reasonable suspicion at the time he saw the gestures, he was neither obligated nor permitted to frisk Sumner at this stage in the traffic stop. However, we recognize that Johnson likely possessed a reasonable concern for safety at this point, albeit not a concern sufficient by itself to justify a protective search.

¶ 35.　The court of appeals relied on *Mohr*'s emphasis on the passage of time to conclude that "the lapse of time between the stop and the frisk mitigated any reasonable suspicion of danger." *Id.,* ¶ 28 (referencing *Mohr*). We do not find that the temporal elements emphasized in *Mohr* and relied upon by the court of appeals are convincing indicators that Johnson's objectively reasonable fears regarding Sumner should have been quelled by the mere passage of time.[15] An officer can be as much in danger at the end of a traffic stop as

---

[15] The instant case is similar to *People v. Jackson,* 948 P.2d 506 (Colo. 1997). In *Jackson,* as officers were stopping a vehicle for a routine traffic violation they observed the defendant, a passenger in the vehicle, take a coat from the back seat and place it on his lap. *Id.* at 506. The officers approached the vehicle, retrieved identification from the defendant, and ran a computer check on the occupants. *Id.* at 507. The check revealed no outstanding warrants for either the driver or the defendant. *Id.* After 10 to 15 minutes, the officers removed the occupants and performed a protective pat-down search of the

at the beginning.[16] Under the circumstances present, Johnson's reasonable belief that he was in danger grew as time passed.

¶ 36. We therefore disagree with the court of appeals that the passage of 15 minutes from the time of the reaching gestures and traffic stop to the time of the protective search mitigated "*any* reasonable suspicion of danger," *id.* (emphasis added), and instead view Sumner's unexplained reaching gestures as one factor in the totality of circumstances that are indicative of Johnson's reasonable suspicion that Sumner was armed and dangerous.[17]

defendant. *Id.* at 507–08. During the search, a plastic bag containing crack cocaine fell from the defendant's pants leg and was seized. *Id.* at 506–07.

The Colorado Supreme Court noted the passage of 10 to 15 minutes between the initial stop, the defendant's movement to the back seat, and the pat-down search. *Id.* at 508. The court upheld the search as reasonable, despite the passage of time from the initial stop to the search. *Id.* The court emphasized that "under the facts of this case, the trial court found specifically that at the time of the pat down of the defendant, the officer was concerned for his safety . . . [and therefore] the purpose of the pat-down search . . . was reasonable." *Id.*

[16] *See State v. Vandenberg*, 81 P.3d 19, 28 (N.M. 2003) ("[W]e refuse to draw a bright-line, temporal cut-off point. We decline to say that an investigating officer cannot be in as much danger at the end of a traffic stop as at the beginning, or at least reasonably believe that to be so.").

[17] When Johnson approached Sumner's BMW, he was wary of the reaching gestures he had seen moments earlier. As the deputy spoke to Sumner, he had the opportunity to observe the contents of Sumner's vehicle. There was a great deal of clutter in the vehicle. Johnson observed nothing—such as a wallet on the front seat—that provided a natural explanation of why Sumner had reached over to the passenger side of the vehicle.

## 2. Suspect's Unusual Nervousness

¶ 37. Johnson testified that Sumner "seemed very nervous" and "was sweating," and the circuit court found that Sumner was "very nervous" and sweating.

¶ 38. Nervousness during a routine traffic stop is typical, but unusual nervousness of a suspect may indicate wrongdoing.[18] Our cases hold that a suspect's unusual nervousness is a legitimate factor to consider in evaluating the totality of circumstances for reasonable suspicion. *Kyles,* 269 Wis. 2d 1, ¶ 54 (citing *McGill,* 234 Wis. 2d 560, ¶ 29; *State v. Morgan,* 197 Wis. 2d 200, 213, 215, 593 N.W.2d 887 (1995)).[19] The record reflects that Sumner was "very nervous," and

Rather, the clutter that Johnson saw on the front seat suggested a convenient place to hide or retrieve a weapon. Although Johnson expressed his concerns to Sumner, Sumner did not offer any explanation of his reaching gestures. As he returned to his squad, Johnson knew that Sumner had not been reaching to get his vehicle registration out of his glove compartment or to find his driver's license because Sumner did not produce any identification. *See Johnson,* 299 Wis. 2d 675, ¶ 43. He did not know why Sumner had been reaching. Thus, the gestures were completely unexplained at the time Johnson conducted the pat-down. In short, nothing that Johnson perceived or heard allayed his concerns.

[18] *See United States v. Bloomfield,* 40 F.3d 910, 918–19 (8th Cir. 1994) (noting that it is customary for a suspect in a routine traffic stop to be "somewhat nervous" but that the "fidget[ing]" behavior of a suspect, in the totality of circumstances, suggested that wrongdoing was afoot).

[19] *See also United States v. Arnold,* 388 F.3d 237, 238 (7th Cir. 2004) ("[Officer Ford] noticed that Arnold appeared very nervous and was sweating 'a little bit.' "); *United States v. McRae,* 81 F.3d 1528, 1531 (10th Cir. 1996) (where an officer observed McRae's "unusual," nervous behavior, such as sitting more upright and adjusting his mirrors to watch the officer.

this type of behavior might reasonably indicate that a threat of harm to Johnson was present.

¶ 39. Visible perspiration can be a symptom of nervousness. In this case, the traffic stop occurred around 9 p.m. in late July. Johnson testified that he did not believe that he himself was perspiring because of the temperature; whereas Sumner acknowledged that he could have been sweating because of the heroin on his person and drug paraphernalia in his vehicle. We observe that, in addition to the appearance of nervousness or erratic behavior—e.g., trembling, shaking or fidgeting hands, shifting eyes, tapping one's fingers or feet, placing one's hands in and out of one's pockets, and the like[20]—visible perspiration is a factor that courts

Officer Colyar testified that "*the way* [McRae] was watching me, *the intensity* with which he was doing it, *yes, I consider that to be unusual.*").

[20] Professor LaFave has listed numerous examples of erratic behavior or unusual appearance that courts have found sufficiently indicate reasonable suspicion:

> a characteristic bulge in the suspect's clothing; observation of an object in the pocket which might be a weapon; an otherwise inexplicable sudden movement toward a pocket or other place where a weapon could be concealed; an otherwise inexplicable failure to remove a hand from a pocket; awkward movements manifesting an apparent effort to conceal something under his jacket; backing away by the suspect under circumstances suggesting he was moving back to give himself time and space to draw a weapon; awareness that the suspect had previously been engaged in serious criminal conduct; awareness that the suspect had previously been armed; awareness of recent erratic and aggressive conduct by the suspect; discovery of a weapon in the suspect's possession; discovery that the suspect is wearing a bullet proof vest as to which he makes evasive denials; and awareness of circumstances which might prompt the suspect to take defensive action because of a misunderstanding of the officer's authority or purpose.

4 Wayne R. LaFave, *Search and Seizure* § 9.6(a), at 628–30 (4th ed. 2004) (footnotes omitted).

have taken into consideration in the totality of circumstances.[21]

¶ 40. Therefore, we consider Sumner's nervous demeanor and visible perspiration as supportive of Johnson's reasonable suspicion in the totality of circumstances.

3. Suspect's Hands in Pockets

¶ 41. Johnson testified that Sumner repeatedly placed his hands in his pockets, even after Johnson ordered him not to do so. Johnson also testified that Sumner followed his instructions, except for putting his hands in his pockets.

¶ 42. The circuit court found that Sumner was putting his hands in his pockets "and he was asked not to do that on a number of occasions." The court acknowledged that there was some question about Johnson's order to Sumner to keep his hands out of his pockets because Johnson had not recounted that point in his police report. However, the circuit court placed this alleged deficiency "in the context of the overall set

---

[21] *See, e.g., State v. Triplett,* 2005 WI App 255, ¶ 2, 288 Wis. 2d 515, 707 N.W.2d 881 ("The officer noticed that Triplett's hands shook and perspiration appeared on his forehead."); *Caldwell v. State,* 780 A.2d 1037, 1043 (Del. 2001) ("The officer testified at the suppression hearing that Caldwell appeared 'extremely nervous,' was perspiring and his hands were shaking."); *P.W. v. State,* 965 So. 2d 1197, 1199 (Fla. Dist. Ct. App. 2007) ("P.W. then walked over to the car and appeared upset and was sweating. The officer asked what P.W. was doing in the area and P.W. responded that he was going to catch a bus. At this point, the officer exited his police car and asked appellant if he could pat him down."); *State v. Rider,* 172 P.3d 274, 276 (Or. Ct. App. 2007) ("Defendant was sweating profusely and was obviously nervous.").

of circumstances" and found that "the defendant was putting his hands into his pockets . . . on a number of occasions." In his testimony, Sumner did not deny that he had been told to keep his hands out of his pockets. ██

¶ 43. We consider a defendant's placing his hands in his pockets repeatedly, despite an officer's admonitions, as a substantial factor in the totality of circumstances. As we stated in *Kyles,* "[o]fficers need to see a person's hands so that they can determine whether the individual is reaching for a weapon. Officers have a legitimate, objective concern for their own safety when an individual reaches into his pockets." *Kyles,* 269 Wis. 2d 1, ¶ 41. Other courts have properly relied upon this factor in evaluating the totality of circumstances,[22] and we do so as well.

---

[22] *See United States v. Harris,* 313 F.3d 1228, 1236 (10th Cir. 2002) ("[T]he more important factor here is that Defendant refused to take his hands out of his pockets after Officer Allen requested that he do so. Officer Allen testified that he asked Defendant to take his hands out of his pockets because he was concerned that Defendant might be concealing a weapon."); *Commonwealth v. Whitmore,* 92 S.W.3d 76, 79 (Ky. 2002) ("When the officer entered the apartment, Whitmore began fidgeting and turning away from her. He then gave the officer a false name and refused to remove his hand from his pocket upon request."); *State v. Gannaway,* 191 N.W.2d 555, 556 (Minn. 1971) ("[Officer] Pelton testified that he warned Gannaway to keep his hands out of his pockets but that Gannaway seemed intent on reaching into the right pocket of his outer coat."); *People v. Smith,* 721 N.Y.S.2d 311, 312 (N.Y. App. Div. 2001) ("The officer noticed that when defendant exited the car, he appeared fidgety and nervous, and was looking over his shoulder, as he stood facing the officer with his hands near his pockets. The officer again asked defendant to show him his hands, and he also asked him if he possessed any weapons. Defendant replied that he did not have any weapons, but he did

¶ 44. Therefore, we consider the fact that Sumner repeatedly put his hands in his pockets, contrary to instruction, as a legitimate and important factor in the totality of circumstances indicating reasonable suspicion to conduct a protective search.

4. Officer's Subjective Fear for His Own Safety

¶ 45. Johnson testified that he informed Sumner he wanted to search Sumner's vehicle because he feared for his own safety. This fear was due to Sumner's gestures to the passenger side of the vehicle and the fact that the vehicle's interior was littered with various objects, which "could have been hiding a weapon." Johnson also testified that when he frisked Sumner he did so as a measure to protect his own safety.

¶ 46. The circuit court found that Johnson's "fear for his safety" was part of the totality of circumstances that justified the protective search.

¶ 47. In *Kyles,* we rejected any rule that an officer's subjective apprehension that an individual is armed may not be considered as part of the totality of circumstances. *Kyles,* 269 Wis. 2d 1, ¶ 39. However, we also held that reasonable suspicion for a protective search does not turn on an officer having a subjective belief that his own safety or that of others is in danger.

---

not produce his hands."); *Williams v. State,* 754 N.E.2d 584, 586 (Ind. Ct. App. 2001) ("Officer Wildauer observed that Williams was nervous, sweating, and his legs were shaking. Officer Wildauer asked Williams, two or three times, to take his hands out of his jacket pocket and away from his waistband, but Williams failed to comply, causing Officer Wildauer to fear for his safety. Officer Wildauer then ordered Williams to place his hands on the police car so that he could conduct a pat down search for weapons. Williams again placed his hand in his pocket.").

*Id.*, ¶ 30.[23] Instead, we determined that an "officer's fear or belief that the person may be armed is but one factor in the totality of the circumstances that a court may consider in determining whether an officer had reasonable suspicion to effectuate a protective weapons frisk." *Id.*, ¶ 39.

¶ 48.　A court may look "to any fact in the record, as long as it was known to the officer at the time he conducted the frisk and is otherwise supported by his testimony at the suppression hearing," to help determine whether a frisk was reasonable. *Id.*, ¶ 10 (quoting *McGill*, 234 Wis. 2d 560, ¶ 24). The record demonstrates additional factors about which Johnson indicated concern. Sumner identified himself orally but never produced any identification to confirm what he said, much less a photo driver's license. That is why taking a fingerprint was necessary. Although he was driving with a suspended license, Sumner called attention to himself by waving to the deputies as he passed, even though his driving maneuver forced other vehicles to take defensive action. Johnson testified that he "couldn't believe" the maneuver and thought Sumner's wave to the deputies was "odd." When questioned, Sumner could not give his street address, but he still asked the deputy to "hurry up." Johnson thought the latter comment was "unusual." In short, Sumner exhibited unusual and erratic behavior.

¶ 49.　Accordingly, we weigh the fact that Johnson feared for his safety as a factor in the totality of circumstances.

---

[23] *See* 4 Wayne R. LaFave, *Search and Seizure* § 9.5(a), at 472 (4th ed. 2004) (noting that the test for reasonable suspicion is "*purely* objective" and that "there is no requirement that an actual suspicion by the officer be shown").

## 5. Totality of Circumstances

¶ 50. We have examined each of the four factors enumerated by the State and pointed to other concerns. We now examine these factors in the totality of circumstances.

¶ 51. The traffic stop occurred at approximately 9 p.m.[24] on July 29, 2004. The vehicle was stopped for a traffic violation on a Milwaukee street. The State does not contend that the area was a high crime area. Sumner made reaching gestures toward the passenger side of the vehicle as he was being pulled over. Johnson approached the vehicle and observed that the passenger compartment was filled with many objects, making it a ready place to hide a weapon. Sumner had no driver's license or identification with him. He could not give a street address.

¶ 52. Johnson was concerned for his safety as soon as he observed Sumner's reaching gestures to the passenger side of the vehicle. He twice asked Sumner to search the vehicle as a protective safety measure, citing Sumner's reaching gestures, lack of identification, and the clutter in the car as indications that Sumner might be hiding a weapon. Sumner offered no explanation of the reaching gestures, but he did ask the deputy to "hurry up."

¶ 53. A computer check on Sumner revealed that his driver's license was suspended. After the computer check, Kevin Johnson wrote a citation while Sumner waited in his vehicle. Johnson monitored Sumner from the squad for about 15 minutes.

---

[24] See State v. Kyles, 2004 WI 15, ¶ 58, 269 Wis. 2d 1, 675 N.W.2d 449 (noting that the time at which a protective search occurs is a factor to be considered in the totality of circumstances).

¶ 54. Johnson and Kevin Johnson then approached Sumner's vehicle. The deputies asked Sumner to step out of the vehicle to fingerprint him and informed Sumner that his BMW would be towed because of his suspended driver's license. Kevin Johnson began searching Sumner's vehicle. Johnson observed that Sumner was "very nervous" and sweating as Kevin Johnson began the search. Sumner was wearing a t-shirt and "sweat pants" or "running pants." His pants contained no unusual bulges, but he repeatedly reached into his pants pockets. Johnson instructed Sumner not to place his hands in his pockets, but he did not comply.

¶ 55. We conclude on these facts that an officer in Johnson's position would possess the objectively reasonable suspicion that Sumner was both armed and dangerous. The time of night, Sumner's initial reaching gestures, the clutter in the vehicle, Sumner's lack of identification and suspended driver's license, Sumner's nervous demeanor, visible perspiration, and other erratic behavior, and the fact that Sumner repeatedly reached into his pockets after being instructed not to do so, all validate Johnson's reasonable suspicion that Sumner was both armed and dangerous under the totality of circumstances.

¶ 56. We reject the contention that Johnson's reasonable suspicion was obviated by the fact that 15 minutes passed between the time of the stop, when Johnson viewed Sumner's reaching gestures, and Johnson's protective search of Sumner. After all, Johnson had kept Sumner under continuous surveillance. The passage of time can be a factor in the totality of circumstances, but it is not likely to be a *determinative* factor in establishing or eliminating reasonable suspicion for a frisk. The passage of time may calm the

nerves of a suspect or build on his apprehension, depending on what the suspect is thinking and what he fears may be disclosed. In the same vein, information gained by an officer, including the officer's observations during a delay, may dispel or heighten the officer's suspicions. The passage of time will have different effects if the officer's computer reveals that a driver has a spotless record, or a suspended license, or an arrest warrant for armed robbery.

¶ 57. In a memorable case, *State v. Kelsey C.R.*, 2001 WI 54, 243 Wis. 2d 422, 626 N.W.2d 777, Milwaukee police officers stopped their squad car to speak with a suspected 15–year-old runaway. *Id.*, ¶ 5. After answering a few questions, she fled. *Id.* When the police gave chase and caught her, they gave the young woman a citation and clarified her status, promising her mother by telephone to give her a ride home. *Id.*, ¶ 6. Before transporting her in their squad car, however, the officer wanted to perform a pat-down search for their safety. *Id.*, ¶ 7. They called for a female officer. *Id.* The officers and the juvenile then waited 20 minutes for the female officer to arrive. *Id.* When she came, the female officer conducted a protective pat-down search and discovered that Kelsey was carrying a small, loaded handgun. *Id.* The passage of 20 minutes did nothing to change the fact that Kelsey had concealed a handgun in her jeans.

¶ 58. In this case, the passage of 15 minutes led to the issuance of a citation and increased Sumner's nervousness, particularly when Kevin Johnson began to search Sumner's vehicle. The passage of time did not counter the cumulative factors for reasonable suspicion.

¶ 59. We do not fault Johnson or Kevin Johnson for choosing not to order Sumner from the vehicle immediately upon speaking with him. Police officers

should be given the discretion to use their professional judgment and experience to determine when it is appropriate to order a suspect from a vehicle to diffuse a potential safety threat. The fact that the deputies chose not to do so immediately should not discount the other factors indicative of Johnson's reasonable suspicion to frisk Sumner.

B. Circuit Court's Factual Finding Regarding Removal of Napkin

¶ 60. Before commenting on the second issue presented for review, we should address a dispute concerning the circuit court's finding of fact regarding who removed the napkin from Sumner's pocket.

¶ 61. Johnson testified that while he was frisking Sumner he became alerted to a lump in Sumner's right rear pocket. Johnson asked what it was, and Sumner replied that it was just a napkin. Johnson testified that Sumner then removed the napkin and placed it on the trunk of his vehicle. Johnson remembered the napkin as a "Subway" napkin.

¶ 62. By contrast, Sumner testified that during the frisk Johnson felt something in Sumner's rear, zippered pants pocket. Johnson asked what it was, and Sumner replied that it was a napkin. Sumner testified that Johnson then unzipped Sumner's pocket, reached in, and pulled out the napkin and opened it. He testified that Johnson asked what was in the napkin, and then Johnson reached into Sumner's pocket and pulled out two more packets of heroin. Sumner testified that no packets of heroin fell to the ground.

¶ 63. Sumner's attorney, Craig Albee, cross-examined Johnson about the pat-down:

MR. ALBEE: And he had a back pocket on
 those sweat pants?

JOHNSON: Yes.

MR. ALBEE: And you felt something, true?

JOHNSON: True.

MR. ALBEE: Something soft?

JOHNSON: I won't say it was soft. I felt
 something.

MR. ALBEE: It clearly was not a weapon; true?

JOHNSON: True.

MR. ALBEE: You didn't know what it was;
 right?

JOHNSON: Correct.

MR. ALBEE: And you asked him what it was?

JOHNSON: Correct.

MR. ALBEE: And then you reached into his
 pocket and took it out.

JOHNSON: No, I didn't. He reached in and
 put it on the trunk of his car.

MR. ALBEE: So Mr. Sumner reached into his
 pocket and grabbed a napkin, is
 [t]hat what you said?

JOHNSON: Yeah. He said—He stated it is just
 a napkin, and put it on the trunk
 of his car.

325

MR. ALBEE: So the reason you were patting Mr. Sumner down is because you had some concern for safety; is that right?

JOHNSON: Correct.

MR. ALBEE: Did you believe he was armed?

JOHNSON: I didn't know if he was or not.

MR. ALBEE: Were you suspicious that he was armed?

JOHNSON: Could have been.

MR. ALBEE: And that's why you had him put his hands in the air?

JOHNSON: Correct.

MR. ALBEE: And you're telling me that you had some concern that you might have been suspicious that he was armed and you let Mr. Sumner reach into his pocket himself?

JOHNSON: At that point, yes.

MR. ALBEE: So you're patting him down for your safety and you let him bring his hands down and reach back into his pocket and pull something out that you don't know what it is; right?

JOHNSON: Correct. At that point I didn't think it was a weapon.

MR. ALBEE: And is that how you were trained is to let the suspect reach into his own pockets when you're patting him down for your own safety?

JOHNSON: I was in a pat down. I wasn't doing a search. I wasn't going to go in his pocket.

¶ 64. The principal object of the suppression hearing was the five packets of heroin. The court was confronted with a choice between sharply conflicting testimony about how the packets or bindles came to light.

¶ 65. In its findings of fact, the circuit court stated: "The court further finds from the credible testimony that [Johnson] *directed the defendant to take what was in his pocket out* because the defendant had responded it was a napkin." (Emphasis added.)

¶ 66. Admittedly, when the court found that Johnson "directed the defendant to take what was in his pocket out," its finding was based on an interpretation of testimony. On a paper record, this finding is somewhat disconcerting.

¶ 67. Nonetheless, the court said it found the testimony of Johnson to be credible and, on several occasions, it adopted Johnson's testimony over Sumner's testimony. The court rejected Sumner's testimony that Johnson unzipped his rear pocket and took out the napkin. It rejected the defendant's testimony that Johnson immediately opened the napkin that had been placed on the trunk. The court adopted

the testimony that Johnson continued to frisk Sumner until "he observed two packets fall from [Sumner's] pants which were later determined to be suspected contraband." "*[L]ater,*" the court found, "the napkin was opened up and it was discovered that there were additional packets of suspected contraband." (Emphasis added.)

¶ 68. Irrespective of how the napkin moved from the defendant's rear pants pocket to the trunk of his vehicle, we are presented with the court's finding of fact that the bindles that Johnson observed on the ground were found independent of and not dependent on the removal of the napkin from Sumner's pocket. The court found that the bindles fell to the ground from Sumner's pants leg as Johnson proceeded to continue the protective search. The bindles on the ground were observed by Johnson and in plain sight. The incriminating nature of the bindles was revealed when Johnson asked Sumner about the bindles and was told that they contained heroin. Sumner then blurted out that he was an addict.

¶ 69. Although the court's finding that Johnson directed Sumner to remove the napkin is troublesome, it does not contradict Johnson's sworn testimony, inasmuch as Johnson was not asked and did not say whether he had said anything more to Sumner than ask what the lump was. The court may have interpreted Johnson's simple question as a request to take the napkin out. We see no useful purpose in remanding this case for clarification inasmuch as the court already found that Johnson did not open the napkin until after he saw two bindles fall from the defendant's pants leg. The court clearly rejected the defendant's testimony on how Johnson found the heroin.

## C. Search of the Vehicle

¶ 70. The State argues that the court of appeals should not have addressed the legality of the search of Sumner's vehicle.

¶ 71. The State may believe it was blindsided by the court of appeals' decision to address this issue, *see* *Sumner,* No. 2006AP102–CR, unpublished slip op., ¶ 11 n.5, inasmuch as search of the vehicle was barely alluded to in Sumner's brief to the court of appeals. Furthermore, the State's contention that the search was justified as an inventory search was not addressed by the court of appeals. On the other hand, because so little attention was paid to the search of Sumner's vehicle at the suppression hearing, the State failed to establish by testimony that the Milwaukee County Sheriff's Department has an established policy on inventory searches of the vehicles it tows.[25] Because the vehicle search played no part in Sumner's conviction, we decline any further discussion of the issue.

## IV. CONCLUSION

¶ 72. We conclude that the protective frisk of Sumner was justified by specific, articulable facts supporting a reasonable suspicion that Sumner was armed and dangerous. With regard to the search of Sumner's

---

[25] In *State v. Weide,* 155 Wis. 2d 537, 455 N.W.2d 899 (1990), we recognized the reasonableness and legality of a police inventory search as long as the search was conducted pursuant to departmental policy and for inventory, not investigatory, purposes. *See id.* at 550–51. We rejected the argument that the departmental policy regarding an inventory search must be in writing and instead upheld an inventory search based on the evidence regarding departmental policy that was presented at a suppression hearing. *Id.* at 549.

vehicle, we conclude that it was not necessary for the court of appeals to address this issue because the vehicle search played no part in Sumner's conviction. Accordingly, we reverse the court of appeals.

¶ 73. *By the Court.*—The decision of the court of appeals is reversed.