PER CURIAM.
¶1 Damon Evans challenges the circuit court's denial of his motion to suppress heroin, cocaine and marijuana found on him during a traffic stop. He also challenges the denial of postconviction relief and the denial of a motion for reconsideration. Evans raises several arguments attempting to show that police officer testimony describing the stop was "inherently not credible." From this premise, Evans urges this court to conclude that there was no valid basis for the stop, and that the officers conducted an illegal strip search. We reject Evans' arguments and affirm.
BACKGROUND
¶2 The three police officers who stopped and searched Evans testified during the two-day suppression hearing. Officer Christopher Navarette testified that he was part of the Milwaukee Neighborhood Task Force Street Crimes Division, assigned to the most violent areas in the city. On May 23, 2013, Navarette and his two partners observed a Dodge Avenger pause and then roll through a stop sign at approximately 8:45 p.m. Navarette illuminated the interior of the Avenger with the squad car's spotlight and observed the sole occupant was not wearing a seat belt. As the vehicle passed, Navarette also noted the tint of the window was darker than allowed by law. He decided to stop the vehicle.
¶3 As the officers approached the vehicle, Navarette testified that the occupant-subsequently identified as Evans-"appeared to be frantically moving around the vehicle," as though he may have been trying to conceal something. Navarette stated at that point he was thinking that "[i]n this area it's more common to encounter weapons whether they're legally carried or illegally carried nowadays." Based on his past experience with encountering weapons during traffic stops, Navarette believed Evans was possibly attempting to retrieve or conceal a weapon.
¶4 Navarette asked Evans to step out of the vehicle and, as he did so, Navarette smelled a very strong, pungent odor of fresh marijuana coming from Evans. Navarette conducted a pat-down to make sure Evans did not have any weapons, and to search for the source of the marijuana smell. Navarette felt a "large hard bulge in the rear pants area" that was about the size of a golf ball. Navarette testified that based on his experience he believed the bulge was packaged drugs. Navarette asked one of his partners to frisk Evans to see what he thought. After his partner did so, Evans was placed in custody.[1]
¶5 After the officers handcuffed Evans, he began to get physical. Evans was asked to spread his legs farther, which he refused to do. Navarette stated that he took control of Evans' left side and another officer took control of Evans' right side, while the third officer shook Evans' pants. A plastic baggie fell out of Evans' left pants leg containing suspected crack cocaine, heroin and marijuana.
¶6 Evans began yelling and screaming, and several people appeared on the scene to watch what was happening. Navarette testified that Evans was "calling us faggot ass cops and gay ass cops and that he was ... going to lie on us and tell them that we went up his ass." Navarette denied putting his hands inside of Evans' pants. During cross-examination, Evans' trial counsel asked the circuit court to take judicial notice that sunset on May 23, 2013, occurred at 8:16 p.m. The court declined, saying counsel had not provided any "basis for taking judicial notice other than your statement."
¶7 Officer Christopher Conway testified that he also observed the Avenger not make a complete stop at the stop sign and, based on his past experience, he suspected the vehicle's window tint was illegal. As he walked toward the vehicle after the stop, Conway saw the driver "basically lean to his right and it looked like he was putting something down to his left, behind him." Conway also said it was getting dark, but the area was illuminated by streetlights as well as the squad car's spotlight and its red and blue lights.
¶8 Conway further testified that he approached the driver's side with Navarette, and smelled the fresh odor of marijuana coming from Evans. He said Navarette did a pat-down of Evans, that Navarette thought he felt something illegal on Evans, and then Navarette asked Conway himself to do a pat-down to check the lump he found. Conway described how his pat-down was done and how he felt a "hard medium[-]size rock" shaped bulge on the back of Evans' upper left thigh. Conway also believed, based on his experience, that the lump was packaged drugs. After handcuffing Evans and asking him to spread his legs farther, Evans started to get physical, and the other two officers each grabbed a side of Evans to restrain him. Conway then grabbed both sides of Evans' belt and shook it three to five times. The narcotics then emerged from Evans' left pants leg. Conway testified the drugs were individually bagged, and he described the drugs as "two chunks of off[-]white chunky substance, suspected crack cocaine. There was a larger amount of heroin, and then two bags of marijuana."
¶9 Conway was adamant that neither he nor the other officers put their hands inside Evans' pants. Conway reiterated that after Evans was taken into custody, he became "extremely agitated, started yelling that we went in his ass and [we] were some faggot ass cops, that he was going to fucking sue us, stuff like that." Conway further testified that another officer, David Coffey, tested the tint on the Avenger at the scene and determined it was illegal.[2]
¶10 Officer Scott Kaiser testified consistent with Navarette and Conway. Kaiser said it was dusk and "still a little bit light out" when he observed the Avenger fail to stop at the stop sign and, when Navarette shined a light in the Avenger's interior, the driver was not wearing a seatbelt. Kaiser went to the passenger side of the Avenger. Kaiser described the pat-downs that he observed performed by Navarette and Conway. Kaiser observed Evans being handcuffed, and when Evans began talking loudly, Kaiser took control of Evans' right side. Kaiser stated that he never saw either officer reach inside Evans' clothing. Kaiser testified that a clear, plastic bag with suspected cocaine, heroin and marijuana fell out of Evans' pants leg.
¶11 Evans presented testimony from two bystanders. Mildred Dixon testified from Las Vegas but stated that she had previously lived in the neighborhood where the officers arrested Evans. Dixon stated the police "snatched" Evans out of the vehicle and "slammed him up against the car." She described the officers kicking his leg, grabbing his hands, and going "inside his pants and his rectum." She testified Evans said he could not breathe. She said the officers did not frisk Evans. On cross-examination, she admitted that the officers' backs were to her and that she was in her yard while they were across the street. Dixon also stated that she did not know if the officer's hand went inside or outside of Evans' underwear.
¶12 Alysia Mayfield testified that she knew Evans and that she "happened to be walking past when police were searching him. It was getting dark so it was probably around 8:30." Mayfield talked to Dixon, who told her what was happening. Mayfield testified that Evans "kept saying they went in his-you know, they went in his behind," but she acknowledged that she did not see that happen.
¶13 Evans testified and claimed he had come to a complete stop at the stop sign prior to his arrest. He also testified that before he got out of the car, he "took my drug that I have for personal use and I put it my rear end [sic] .... In my butt hole. ... [I]nside my drawers up my butt, between my booties." He said the officers "snatched" him out of the vehicle, one officer on each side of his arms and another officer behind him, and they immediately handcuffed him. Evans further testified that when the officers felt the lump, Evans "tr[ied] to play" like it was a boil. The officers then began shaking his pants. When the bag did not fall out, the officers reached in Evans' pants and underwear and removed it. Evans stated that one of the officers then put his "hand in a bladed position between my buttocks area, like between the crack of my butt." Evans testified the officer's hand was in his pants for ten seconds.
¶14 After summarizing the evidence, the circuit court found that the testimony of Evans, Mayfield, and Dixon was not credible. The court also found that no witness testified that any part of Evans' body was uncovered during the search.
¶15 The circuit court determined that
the officers clearly had a reasonable and articulable suspicion to stop the defendant when he went through the stop sign without making a complete stop, also when he did not have his seat belt on when operating the motor vehicle, also when the side windows were tinted beyond the legal limit.
The court also found that when the officers made the stop, they saw Evans make movements similar to someone who potentially had a weapon. Evans' frantic movements and the high-crime area of the stop justified the frisk.
¶16 The circuit court also found that after the officers felt something during the pat-down they believed was drugs, "they certainly could then follow through and shake the defendant's pants to see if the drugs would fall out." Once the suspected drugs fell out, the officers had probable cause to arrest Evans. In any event, the officers would have inevitably discovered the drugs without conducting the on-scene search. The court determined the officers could have arrested Evans on his outstanding warrants, and the drugs would have been discovered when he was searched incident to arrest. See Davis v. United States , 564 U.S. 229, 232 (2011).
¶17 Following his conviction by a jury, Evans filed a notice of intent to pursue postconviction relief, and he filed a notice of appeal. Evans discharged his appointed counsel, and the notice of appeal was dismissed with leave to file another postconviction motion after new counsel was retained. Evans then filed a pro se postconviction motion, seeking a new trial or resentencing on the basis of an erroneous exercise of sentencing discretion. Evans also argued his trial counsel was ineffective for failing to aggressively challenge a witness's testimony at the suppression hearing and for failing to request a lesser-included offense jury instruction. The circuit court denied the motion.
¶18 Evans then filed a second motion for postconviction relief by counsel. Evans argued that Navarette's testimony was "inherently not credible." He also contended the officers were not permitted to recover the drugs after feeling them during the pat-down, and the officers were only permitted to pat him down for weapons. Evans also argued Navarette violated his constitutional rights by placing his hand inside his pants, and violated Wisconsin law for conducting strip searches.
¶19 The circuit court rejected Evans' arguments and denied the second postconviction motion. A subsequent motion for reconsideration was also denied, and Evans now appeals.
DISCUSSION
¶20 We conclude the circuit court properly determined that the stop, the search of Evans, and the seizure of the drugs were all proper. The stop was based upon reasonable suspicion that Evans had committed traffic offenses. The frisk was justified by Evans' suspicious behavior as they approached his vehicle in a high-crime area, and the incriminating nature of the suspected drugs was immediately apparent during the pat-down.
¶21 The facts established at the suppression hearing showed that the stop of Evans' vehicle was based on reasonable suspicion, as the officers observed three potential traffic violations: the failure to stop at a stop sign; the failure to wear a seat belt; and illegally tinted windows. See State v. Floyd , 2017 WI 78, ¶21, 377 Wis. 2d 394, 898 N.W.2d 560. As the circuit court noted, the officers could reasonably have stopped Evans for any of these possible violations.
¶22 The officers had reasonable suspicion to frisk Evans based on his post-stop movements indicating he might be armed, as they approached Evans' vehicle in a high-crime area. See State v. Nesbit , 2017 WI App 58, ¶6, 378 Wis. 2d 65, 902 N.W.2d 266. Navarette saw Evans "frantically moving around the vehicle as though he was possibly attempting to retrieve or conceal something." Based on Navarette's experience and the nature of the area of the stop, he believed it might be a weapon. An unexpected reaching movement or a furtive gesture by a suspect during a traffic stop can be a factor contributing to reasonable suspicion that the suspect has a weapon. See State v. Sumner , 2008 WI 94, ¶26, 312 Wis. 2d 292, 752 N.W.2d 783.
¶23 Once the officers felt the bulge above Evans' left thigh, they were permitted to seize it. The plain touch exception to the warrant requirement applies when an officer touches or feels an object during a pat-down, which his or her training and experience would lead the officer to believe may be contraband. State v. Applewhite , 2008 WI App 138, ¶12, 314 Wis. 2d 179, 758 N.W.2d 181. In addition, the plain touch exception does not demand that the officer be absolutely certain of what specific contraband is present, only that the object is reasonably suspected to be incriminating in nature. Id. , ¶16. Evans argues the officers "detected a golf ball[-]size bulge, which could not possibly be a weapon." While a pat-down search for weapons is not a general evidentiary search, an officer is not required to look the other way when inadvertently discovering evidence of wrongful behavior during a legitimate frisk. Id. , ¶18.
¶24 Navarette and Conway both testified that based upon their experience, they thought the bulge was packaged drugs. In addition, the officers smelled fresh marijuana, the item was in the rear of Evans' pants, and the officers had just seen him making furtive movements consistent with placing something behind him, which also suggested that the item was contraband. Once the officers reasonably believed the bulge was packaged drugs, the officers were allowed to shake the contraband out of Evans' pants and seize it.
¶25 On appeal, Evans restates his argument that Navarette's testimony was "inherently not credible." He claims the officer could not have seen the tinted windows because it was dark outside. Evans claims that "[w]hereas Officer Navarette claimed it was still light out at 8:45 p.m. on May 23, 2013, the sun actually set by 8:17 p.m. on that day." He adds that "there was just four minutes left of civil twilight" at 8:45 p.m. According to Evans, "[t]his was by far the most important factor in determining the truthfulness of Navarette's testimony." Evans acknowledges that his trial attorney asked the circuit court to take judicial notice of this "glaring disparity" but "apparently was unprepared to show proof beyond his saying what time the sun set."
¶26 As the circuit court correctly noted in its postconviction decision:
The stop occurred around 8:45 p.m. [Evans] asserts that trial counsel should have supported his request for the court to take judicial notice of sunset occurring at 8:16 p.m. on May 23rd with data showing this fact, as he has provided in the sunset table designated as Exhibit B. Exhibit B also shows that twilight occurred at 8:49 p.m. "Twilight" is defined by the Oxford Dictionary as "the soft glowing light from the sky when the sun is below the horizon, caused by the reflection of the sun's rays from the atmosphere." It was not dark out. Even defense witness Mildred Dixon testified that it wasn't dark outside yet.
(Footnote omitted.)
¶27 Accordingly, Navarette was not the only witness who said it was still light out. Indeed, numerous other witnesses testified it was not yet dark at the time of the stop, including defense witnesses Dixon and Mayfield. Moreover, Evans cannot explain how Navarette was prevented from observing traffic violations even if it was dark out. Street lights were present in the area and the officer utilized the squad car's spotlight to see that Evans was not wearing his seat belt and that his windows were improperly tinted. Evans is wrong that he has proven Navarette must have been lying because the officers could not have seen a traffic violation due to the absence of sunlight.
¶28 Evans next argues that Navarette admitted that Evans stopped at the stop sign. However, Navarette testified the vehicle "slightly paused and it rolled through the stop sign." Evans contends that by using "pause," Navarette necessarily meant that Evans stopped. Evans is again wrong. Navarette consistently stated that Evans did not stop. Semantic parsing of Navarette's language is not enough to show that the circuit court was clearly erroneous in finding that Evans failed to stop. In addition, Conway also testified that Evans did not make a complete stop, stating, "It's kind of like a tap on the brake kind of thing and then go. That's what first drew our attention to him." Kaiser also testified that Evans "refused to stop at a stop sign at a controlled intersection." All of this testimony supported the court's finding that reasonable suspicion justified the stop. See Floyd , 377 Wis. 2d 394, ¶11.
¶29 Similarly, Evans argues the glare from the Avenger's headlights and the angle of Navarette's observation would have made it "utterly impossible" for him to see through the windshield. However, the circuit court found Evans' argument "spurious," and it was within the court's province to believe Navarette and the other officers who testified that they could observe Evans through the Avenger's windshield. Evans has failed to show the court was clearly erroneous in finding that the officers could see that Evans was not wearing a seat belt, much less that the windows were improperly tinted. As mentioned, Navarette's testimony was not the only basis for the court's decision; the three officers testified consistently, and the court could have relied upon Conway's and Kaiser's testimony, which Evans does not cogently challenge. In any event, Evans admitted that he did not buckle up until after the police stopped him. And Evans' trial attorney was not ineffective for conceding the police had grounds to stop Evans based on Evans' own testimony that he was not wearing his seat belt until after the stop.
¶30 Evans also argues that the circuit court would have believed his testimony that Navarette put his hands down Evans' pants if the court had known that Navarette had been sued for conducting searches; that a legal settlement for such events had occurred; and that Evans won a suppression motion in a different case involving a search by a different Milwaukee County police officer who was charged criminally for conducting illegal searches.
¶31 However, Evans' purported documentation of these events does not prove what he claims it does. Evans is not a listed plaintiff on the referenced complaint, and it is not clear that the settlement agreement that Evans attached to his motion involved a claim filed against Navarette. Regardless, the attached settlement agreement does not admit liability, so Evans cannot establish Navarette engaged in any improper conduct from it. Moreover, Evans has provided no proof about his earlier, purportedly successful suppression motion, and Evans does not explain how prevailing in a suppression motion in a different case involving a different officer has anything to do with the issues involved in this case.
¶32 Nevertheless, Evans insists that Navarette touched his buttocks or anus when retrieving the drugs. However, the circuit court found Evans' version of events was not credible. The court rejected Evans' testimony that the drugs were partially in his anus and that Navarette put his hand down Evans' pants to retrieve them. As the court also noted, "no witness at all said that the defendant had any part of his body uncovered with any type of clothing." The court also found not credible Dixon's testimony that the officer's hand went "inside his pants and his rectum." With regard to Mayfield's testimony, the court stated, "I don't find her testimony of events credible, either."
¶33 Quite simply, the circuit court found the officers' testimony about the events more credible than the testimony of Evans or his witnesses, and it was entitled to do so. See State v. Kimbrough , 2001 WI App 138, ¶29, 246 Wis. 2d 648, 630 N.W.2d 752. The three officers all testified consistently about the search, and the court credited the officers' testimony that the drugs were at the top of Evans' left thigh and the officers shook them out of his pants. Although the court did not specifically state that it believed the officers' testimony, such a finding is implicit in the court's decision. See State v. Echols , 175 Wis. 2d 653, 673, 499 N.W.2d 631 (1993). The court's decision tracked the officers' version of what happened during the stop and search. The facts established by the officers' testimony show that Evans' drugs were lawfully seized.
¶34 Because we conclude the search of Evans was proper, we need not reach the alternative issue of whether law enforcement would have inevitably discovered the drugs.
By the Court.- Judgment and orders affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5. (2017-18).

After Evans was placed in custody, the officers learned he had outstanding warrants for traffic violations. Officer Navarette testified that checking for warrants was a routine part of a traffic stop.

Officer Coffey testified that he has a tint meter that tests window tint, and he was called to determine if the window tint on Evans' vehicle was legal.