MATTHEW MORRISON       &ast;     NO. 2022-CA-0051

VERSUS           &ast;

              COURT OF APPEAL

NEW ORLEANS POLICE     &ast;
DEPARTMENT           FOURTH CIRCUIT

              &ast;

              STATE OF LOUISIANA

        &ast; &ast; &ast; &ast; &ast; &ast; &ast;


APPEAL FROM
CITY CIVIL SERVICE COMMISSION ORLEANS
NO. 9188
Honorable Alexandra E. Mora, Hearing Officer
* * * * * *
**Judge Rosemary Ledet**
* * * * * *

(Court composed of Judge Rosemary Ledet, Judge Paula A. Brown, Judge Tiffany Gautier Chase)


Donovan A. Livaccari
LIVACCARI LAW LLC
101 W. Robert E. Lee Blvd., Suite 402
New Orleans, LA 70124

    COUNSEL FOR PLAINTIFF/APPELLEE

Michael J. Laughlin, ASSISTANT CITY ATTORNEY
Elizabeth Robins, DEPUTY CITY ATTORNEY
Donesia D. Turner, SENIOR CHIEF DEPUTY CITY ATTORNEY
Kevin C. Hill, CITY OF NEW ORLEANS ATTORNEY
Churita H. Hansell, CHIEF DEPUTY CITY ATTORNEY
1300 Perdido Street
City Hall - Room 5E03
New Orleans, LA 70112

    COUNSEL FOR DEFENDANT/APPELLANT

              **AFFIRMED**
              **July 13, 2022**

*RML*

*TGC*

*PAB*

This is a Civil Service Commission of the City of New Orleans ("CSC") case. The Appointing Authority—the New Orleans Police Department ("NOPD")—disciplined Sergeant Matthew Morrison ("Sgt. Morrison"), an officer with permanent status. NOPD imposed a one-day suspension for each of six sustained violations of its Search and Seizure Policy manual ("Search and Seizure Policy")—a total six-day suspension. CSC partially granted Sgt. Morrison's appeal. Finding NOPD established only one of the violations, CSC reduced the suspension from five days to one day. From CSC's decision reducing the discipline, NOPD appealed to this court. For the reasons that follow, we affirm CSC's decision.

**FACTUAL AND PROCEDURAL BACKGROUND**

The discipline at issue stems from a field search of an arrested, male suspect that occurred on May 31, 2018. On that date, NOPD officers stopped the suspect; the officers believed the suspect to be in possession of a stolen bicycle. The suspect was riding one bicycle and pulling a second one. When the officers stopped the suspect, he ran. The officers chased the suspect on foot, and they used a Taser—a

1

form of force—to subdue the suspect. Because the officers used force, NOPD sent superior officers, including Sgt. Morrison, to the scene.

When Sgt. Morrison arrived, he observed the handcuffed suspect sitting in the back seat of a police car; the suspect was squirming in apparent attempt to destroy contraband. Sgt. Morrison ordered the officers to remove the suspect from the police car. Sgt. Morrison then spotted possible narcotics in the rear of the police car. Sgt. Morrison ordered one of the arresting officers—Officer John Galman—to pat down the suspect.[1] Sgt. Morrison, however, instructed Officer Galman not to remove the suspect's pants; instead, he instructed Officer Galman to pat down the suspect's outer clothing.

While other officers held up the suspect's pants,[2] Officer Galman patted down the suspect. Officer Galman reported to Sgt. Morrison that he felt something in the suspect's crotch area. Sgt. Morrison instructed Officer Galman to "grab it." Before attempting to do so, Officer Galman put on rubber gloves. Officer Galman then put his gloved hand inside the suspect's underwear. Officer Galman, however, was unsuccessful in pulling anything out. This attempt to reach-in and "grab it" lasted about seven seconds.

Because the stop of the suspect involved the use of force, Sgt. Morrison was required to complete a Blue Team Report. Lieutenant Kevin Burns, Jr. ("Lt. Burns")—Commander of the Force Investigation Team (part of the Public Integrity Bureau ("PIB")—reviewed Sgt. Morrison's Blue Team Report and the BWC

---

[1] Both Sgt. Morrison and Officer Galman were wearing body worn cameras that captured the search (the "BWC Videos"). A copy of the BWC Videos was introduced at the civil service hearing and is included in the record on appeal.

[2] Before Sgt. Morrison arrived, the officers had removed the suspect's belt; the suspect was wearing multiple pairs of pants.

2

Videos. Based on his review, Lt. Burns initiated a complaint against, among others, Sgt. Morrison, in May 2018. The stated reason for initiating the complaint included the fact that Sgt. Morrison's Blue Team Report failed to describe any exigency to support a strip search.[3]

Sgt. Morrison was accused of five violations of NOPD's Search and Seizure Policy. The first alleged violation was failing to inform the suspect of the reason for the search and the manner in which the search would be performed (Violation 1). The other five violations related to the procedure required for conducting a strip search—failing to obtain written authorization from a supervisor to conduct a strip search (Violation 2); conducting a strip search in a public place (Violation 3); failing to establish a threat to the officer's safety or the safety of others from the handcuffed suspect (Violation 4); and failing to prepare NOPD's written strip search form (Violation 5).[4]

Once the complaint was initiated, NOPD assigned the matter to Sergeant Jason Lewis ("Sgt. Lewis"), a member of PIB's investigative unit. Sgt. Lewis obtained an extension to complete his investigation. As part of his investigation, Sgt. Lewis reviewed the BWC Videos and the Blue Team Report; and he interviewed witnesses, including Officer Galman. Sgt. Lewis recommended that all five alleged violations be sustained.

_____

[3] NOPD Chapter 1.2.4, Search and Seizure, STRIP SEARCHES, Paragraph 48, provides that "[o]fficers shall not conduct field strip searches of arrestees except in rare and exigent circumstances when the life of the officers or others may be placed at risk and the officer has articulable probable cause that the subject is concealing a weapon or contraband." Although the officers thought the suspect was concealing contraband, the other requirement of a threat to the officer's safety or the safety of others appeared to be lacking. When Sgt. Morrison arrived, the suspect had been arrested and handcuffed.

[4] *See* NOPD Chapter 1.2.4, Search and Seizure, STRIP SEARCHES, Paragraphs 47 to 49.

In December 2018, Chief Arlinda Westbrook completed a cover letter recommending that Sgt. Morrison be accused of an additional violation—the performance of a body cavity search without a search warrant (Violation 6).[5] Six months later, Captain Simon Hargrove, who was assigned to the PIB, held a Pre-Disposition Conference and recommended that all six alleged violations be sustained. Following a hearing, Commander Lejon Roberts recommended Sgt. Morrison be suspended for one day per sustained violation—a total six-day suspension. Thereafter, in July 2020, Superintendent Shaun Ferguson issued a Suspension Letter to Sgt. Morrison. In the Suspension Letter, Superintendent Ferguson enumerated the six sustained violations and the discipline imposed—a six-day suspension.[6] Sgt. Morrison appealed to CSC.

---

[5] NOPD Captain Hargrove explained at the hearing that "cover lettering" an investigation means that Rank either wanted to remove an allegation, add an allegation, or sustain an allegation that was not initially sustained.

[6] In the Suspension Letter, Superintendent Ferguson summarized the investigation as follows:

> Sgt. Lewis reviewed the Body Worn Camera footage of the arresting officers. He stated he observed you arrive on scene to assess the incident. You advised your officer to remove the subject from the rear of the police vehicle as he was moving around. Upon the subject being removed, you were observed searching the rear of the police vehicle and discovered possible narcotics. You then instructed the officer to search the subject again. You were heard stating to your officer, "I want you to feel up in his junk, but the exterior". Your officer stated that he felt something in the subject's crotch. You were observed lifting the subjects arms up higher behind his back, participating in the search with the officer. You then told your officer to "just grab it. Go in there and grab it" after your officer again told you that he felt something. Sgt. Lewis stated you were observed on the officer's BWC watching the officer's hand and arm come into contact with the subject's buttocks as he was searching inside the subject's pants. Sgt. Lewis stated that upon reviewing the Blue Team Report, you believed that a field strip search was conducted based on your understanding that exigent circumstances included the subject attempting to destroy evidence. You stated that you told the officer not to remove the subject's pants and when the officer advised you that he could feel a bulge in the groin area of the subject, you instructed the officer to "go in and get it". You stated that you did not feel this was a strip search based upon your understanding of the policy.

At the civil service hearing, NOPD called three witnesses—Sgt. Lewis, Captain Hargrove, and Commander Roberts. None of NOPD's witnesses was present at the scene of the search; their testimony focused on the investigation, especially the content of the BWC Videos and the complaint. Sgt. Morrison testified on his own behalf and called one other witness, Officer Derrick Williams—an officer who was present on the scene when the search occurred.

Based on the evidence presented, CSC denied Sgt. Morrison's appeal as to Violation 1, but granted his appeal as to Violations 2 to 6. CSC ordered NOPD to correct Sgt. Morrison's personnel record to reflect a one-day, instead of a six-day, suspension and to reimburse Sgt. Morrison back pay and other emoluments of employment for five days of the six-day suspension. NOPD filed a rehearing motion; CSC denied the motion. From CSC's final decision, NOPD appealed to this court.[7]

**Governing Legal Principles and Standard of Review**

The Louisiana Constitution provides that "[n]o person who has gained permanent status in the classified state or city service shall be subjected to disciplinary action except for cause expressed in writing." LA. CONST., ART. X, § 8(A). NOPD officers are included in this constitutional protection. *See Fulton v. Dep't of Police*, 17-0523, p. 3 (La. App. 4 Cir. 12/6/17), 234 So.3d 107, 110 (citing *Walters v. Dep't of Police of New Orleans*, 454 So.2d 106, 112 (La. 1984)). "A classified employee subjected to such disciplinary action shall have the right of appeal to the appropriate commission." *Id.* Here, the appropriate commission is CSC.

---

[7] Sergeant Morrison did not appeal CSC's decision denying his appeal as to Violation 1; hence, Violation 1 is not before this court.

When such a classified employee appeals a disciplinary action to CSC, the following principles apply:

- CSC is required "to decide independently from the facts presented whether the appointing authority has a good or lawful cause for taking disciplinary action and, if so, whether punishment is commensurate with the dereliction." *Whitaker v. New Orleans Police Dep't.*, 03-0512, p. 2 (La. App 4 Cir. 9/17/03), 863 So.2d 572, 574.

- The appointing authority has the burden of proof as to the facts. LA. CONST., ART X, § 8(A).

- "The appointing authority must prove by a preponderance of the evidence the occurrence of the complained of activity and prove that the conduct complained of impaired the efficiency of the public service and that it bears a real and substantial relationship to the efficient operation of the public service." *Cittadino v. Dep't of Police*, 558 So.2d 1311, 1315 (La. App. 4th Cir. 1990).

- The legal basis for CSC making any change in the appointing authority's disciplinary action is limited to the appointing authority's failure to establish sufficient cause for its disciplinary action. *Branighan v. Dep't of Police*, 362 So.2d 1221, 1222 (La. App. 4th Cir. 1978).

- In this context, the term cause has two components—(i) the occurrence of the complained-of conduct; and (ii) an impairment of public service in which the appointing authority is engaged. *Newkirk v. Sewerage & Water Bd. City of New Orleans*, 485 So.2d 626, 628 (La. App. 4th Cir. 1986) (separately addressing cause and impairment elements); *Gast v. Dep't of Police*, 13-0781, pp. 3-4 (La. App 4 Cir. 3/13/14), 137 So.3d 731, 733.

- CSC, thus, must first determine if the appointing authority has met its initial burden—established the occurrence of the complained-of conduct and the impairment. If that initial burden is met, then CSC must determine if the discipline imposed is commensurate with the misconduct. *Abbott v. New Orleans Police Dep't*, 14-0993, p. 7 (La. App. 4 Cir. 2/11/15), 165 So.3d 191, 197.

Simplified, before CSC, the appointing authority has the burden of proving three elements—(1) the occurrence of the complained-of conduct—misconduct; (2) the impairment, as a result of the misconduct, of the department's efficiency—

6

impairment; and (3) the imposition of discipline commensurate with the misconduct—punishment.[8]

CSC's final decision is "subject to review on any question of law or fact upon appeal to the court of appeal wherein the commission is located." LA. CONST., ART X, §12(A). An appeal from a final decision of the CSC, thus, is to this court. When a CSC decision is appealed to this court, the applicable standard of review is as follows:

- Appellate courts review civil service cases applying a mixed standard of review, depending on the nature of the issue being addressed. *Pitre v. Dep't of Fire*, 21-0632, p. 7 (La. App. 4 Cir. 4/20/22), 338 So.3d 79, 75 (citing *Russell v. Mosquito Control Bd.*, 06-0346, pp. 7-8 (La. App. 4 Cir. 9/27/06), 941 So.2d 634, 639-40).

- On factual issues, deference should be given to CSC's factual conclusions. A reviewing court should apply the clearly wrong or manifest error rule prescribed generally for appellate review. *Mathieu v. New Orleans Pub. Library*, 09-2746, p. 5 (La. 10/19/10), 50 So.3d 1259, 1262.

- On legal issues, an appellate court in CSC cases applies a *de novo* standard of review. "When the civil service board has committed a reversible legal error, the reviewing court should make its own *de novo* review of the record and render a judgment on the merits, if possible. A legal error occurs when the lower court applies incorrect principles of law and such errors are prejudicial." *Voltolina v. City of Kenner*, 20-151, pp. 4-5 (La. App. 5 Cir. 12/2/20), 306 So.3d 640, 644 (internal citations omitted).[9]

- On mixed factual and legal issue, the manifest error standard of review applies. In CSC cases, as in other civil cases, mixed questions of law and fact are reviewed under the manifest error standard. *Russell*, 06-0346, p. 8, 941 So.2d at 640 (observing that "a mixed question of fact and law should

---

[8] As discussed elsewhere in this opinion, the parties stipulated at the civil service hearing to two of the three elements—impairment and punishment; hence, the only element remaining in dispute before CSC was misconduct. The sole issue is whether the appointing authority—NOPD—carried its burden of proving the complained-of behavior occurred—misconduct.

[9] *See also Walters,* 454 So.2d at 113 (observing that "[i]n reviewing the commission's procedural decisions and interpretations of law the court performs its traditional plenary functions of insuring procedural rectitude and reviewing questions of law").

be accorded great deference by appellate courts under the manifest error standard of review").[10]

- "Then, the court must evaluate the commission's imposition of a particular disciplinary action to determine if it is both based on legal cause and is commensurate with the infraction; the court should not modify the commission's order unless it is arbitrary, capricious, or characterized by abuse of discretion. 'Arbitrary or capricious' means the absence of a rational basis for the action taken; 'abuse of discretion' generally results from a conclusion reached capriciously or in an arbitrary manner." *Mathieu*, 09-2746, pp. 5-6, 50 So.3d at 1262-63 (internal citations omitted).

**Application of Precepts**

As the Hearing Examiner observed, this is a sufficiency of cause dispute. As noted elsewhere in this opinion, the parties stipulated at the civil service hearing to two of the three required elements of proof—impairment and punishment; the only element in dispute before CSC was the occurrence of the complained-of conduct—misconduct. Generally, the issue of whether the complained-of conduct occurred is a factual one; as one court has noted, "[a] determination of the existence of legal cause consists, at least in part, of a factual finding that certain behavior occurred." *Marcantel v. Dep't of Transp. & Dev.*, 590 So.2d 1253, 1255 (La. App. 1st Cir. 1991). Here, it is undisputed that Sgt. Morrison supervised and directed the search of the suspect. The dispute is whether the search, under the definitions set forth in NOPD's Search and Seizure Policy, was a strip search, a body cavity search, or both.

NOPD acknowledges that every violation it found Sgt. Morrison committed occurred due to him performing a strip search, a body cavity search, or both. All

---

[10] *See also Perry v. Dep't of Law*, 17-0609, p. 4 (La. App. 4 Cir. 1/31/18), 238 So.3d 592, 596 (observing that "[s]ince this matter involves the Civil Service Commission and is one regarding findings of law and fact, we will review this matter under a manifest error/clearly erroneous standard of review"); *Shannon v. Dep't of Police*, 18-0145, p. 5 (La. App. 4 Cir. 9/19/18), 255 So.3d 1251, 1254. (observing that "a mixed question of fact and law should be accorded great deference by appellate courts under the manifest error standard of review").

five violations at issue (Violations 2 to 6) stem from Sgt. Morrison's alleged failure to follow NOPD's Search and Seizure Policy procedures for those two type of searches. As to Violations 2 to 5, NOPD points out that it is undisputed Sgt. Morrison failed to obtain written authorization from a supervisor, conducted the search in public, had no threat to his safety or others from the handcuffed suspect, and failed to prepare NOPD's written strip search form. The dispute is only whether a strip search was conducted, giving rise to the need for Sgt. Morrison to comply with these requirements set forth in NOPD's Search and Seizure Policy. Likewise, as to Violation 6, NOPD points out that it is undisputed Sgt. Morrison did not obtain a search warrant for a body cavity search—a requirement under NOPD's Search and Seizure Policy. The sole issue is whether a body cavity search was conducted, giving rise to the requirement of a search warrant for such search.

Recapping, NOPD's Search and Seizure Policy requirements that Sgt. Morrison is accused of violating do not come into play if the search conducted was neither a strip search nor a body cavity search. The issue presented, thus, turns on whether CSC properly construed and applied the terms strip search and body cavity search as defined in NOPD's Search and Seizure Policy to the facts. This is a mixed question of fact and law; hence, a manifest error standard of review applies. *Russell*, 06-0346, p. 8, 941 So.2d at 640; *Perry*, 17-0609, p. 4, 238 So.3d at 596; *Shannon*, 18-0145, p. 5, 255 So.3d at 1254.

NOPD's Search and Seizure Policy defines the two types of searches at issue as follows:

- A strip search is "[a]ny search of an individual that includes the removal or rearrangement of some or all clothing to permit a visual inspection of the suspect's groin/genital area, buttocks, female breasts, or undergarments covering these areas. (Violations 2 to 5 turn on this definition.)

9

- A body cavity search is "[a]ny visual or physical inspection of a person's genital or anal region with or without physical contact or intrusion into a body cavity. (Violation 6 turns on this definition.)

The two definitions to some extent overlap.[11] The overlap between the definitions as applied to the facts of this case was noted by Hearing Examiner, who observed:

> Under one interpretation of these definitions, these two types of searches could be read to mean essentially the same thing, at least with regard to genital region or anal region. . . . Thus, they could both be read to mean that a glance at or touching of buttocks, without removing clothing, and without any intrusive touching amounts to both a body cavity search and a strip search. Thus, NOPD appears to have brought charge number (6) six purely on the grounds that glancing down at a suspect's buttocks while reaching to grab something that Officer Galman felt during an exterior search is a body cavity search.

> However, this interpretation of a body cavity search does not make sense as it is indistinguishable from a strip search, and is not consistent with the general understanding of the term. Courts that have considered visual body cavity searches define it as where the subject's body parts are clearly visible, and, in the case of a visual search, the subject is asked to position themselves for a visual search of their cavities—either by squatting, bending over, coughing or spreading their buttocks . . . . None of this occurred here.[12]

With regard to the alleged body cavity search, the Hearing Examiner observed:

> [Officer] Galman said he felt something when he was doing an exterior pat down, which would suggest that the item was loosely sitting in the subject's underclothes and not being kept in a cavity or between the subject's buttocks. The suspect's clothes were not removed, he was not asked to manipulate his body parts for inspection, nor was he asked

---

[11] As a commentator has observed, "the terms used to describe and categorize the searches, such as strip search, visual body cavity search, and physical body cavity search, are often used interchangeably in court opinions and in state legislation. This inconsistency in language results in a confused body of law." William J. Simonitsch, *Visual Body Cavity Searches Incident to Arrest: Validity Under the Fourth Amendment*, 54 U. MIAMI L. REV. 665, 667 (2000); *see also Amaechi v. West*, 237 F.3d 356, 365 (4th Cir. 2001) (observing that "the states define strip search in a uniform fashion")).

[12] *See Sloley v. VanBramer*, 945 F.3d 30 (2d Cir. 2019); *United States v. Perez*, 977 F.3d 163 (1st Cir. 2020); *People v. Wade*, 208 Cal.App.3d 304, 305; 256 Cal.Rptr. 189 (Ct. App. 1989); *Marks v. Smith*, 241 F.Supp.3d 726 (E.D. La .2017).

to position himself for a visual inspection. Thus, charge number (6) six is simply not supported by the facts."

Agreeing with the Hearing Examiner, CSC concluded:

> The evidence in the record indicates that Officer Galman felt something in the suspect's groin area. [Sgt. Morrison] then told [Officer] Galman to "go get it." . . . [T]he testimony at the hearing shows that the intent was for Officer Galman to "shake or tug" on the suspect's undergarments to dislodge any object concealed therein, not to perform a "visual or physical inspection...of (the suspect's) genital or anal area" as required by the NOPD Policy Manual.

Likewise, both the Hearing Examiner and CSC found no strip search

occurred. The Hearing Examiner observed as follows:

> [Officer] Galman was not instructed to search through the clothing or conduct a visual inspection of the subject, just to grab what he felt. Other then perhaps a glance at the subject's buttocks while putting his hand down to retrieve the item, it does not appear that anyone saw the subject's genitals, buttocks or that his underwear were being visually inspected. Thus, there was no strip search. This would appear to be a simple pat down/search or frisk or some other type of search."

Agreeing with the Hearing Examiner, CSC concluded:

> The evidence presented was insufficient to prove that there was a "rearrangement of some or all of the clothing to permit visual inspection of the suspect's groin/genital area, buttocks...or undergarments covering those areas." Officer Galman had already removed the suspect's belt, causing his pants to fall, exposing the undergarments, before [Sgt. Morrison] even arrived on the scene. Furthermore, after [Sgt. Morrison] arrived, he at one point specifically told [Officer] Galman not to pull down the suspect's pants. The evidence in the record indicates that the officers' intent on the scene relative to the search was for Officer Galman to "shake or tug" on the suspect's undergarments to get any object to dislodge from any hidden area. NOPD failed to carry its burden of proving that there was any intent to do a "visual inspection" as required by the definition of "strip search." Since NOPD failed to carry its burden of proving that a "strip search" was conducted, the appellant's one day suspensions for alleged violations 2, 3, 4, and 5 were improper.

11

On appeal, NOPD contends that CSC's conclusion the search was not a strip search, body cavity search, or both is erroneous for two reasons.[13] First, NOPD contends that given its Search and Seizure Policy was drafted to comply with the Consent Decree entered into by NOPD and the City of New Orleans with the United States Department of Justice (the "Federal Consent Decree"), CSC erred in failing to defer to NOPD's efforts to strictly enforce its Search and Seizure Policy. Second, NOPD contends that CSC's conclusion that no strip search or body cavity search occurred is not supported by the testimony at the civil service hearing and the BWC Videos.

Sgt. Morrison counters that CSC's decision has no impact on NOPD's compliance with the Federal Consent Decree. Sgt. Morrison further counters that CSC's decision was based on common usage of the terms strip search and body cavity search, application of the English language, and the generally prevailing meaning of the terms.[14] Sgt. Morrison points out that the Hearing Examiner conducted a persuasive analysis of the definitions of the terms in her report, addressing the overlap between the terms, the common usage of the terms, and the generally prevailing meaning of the terms.

To address these arguments, we divide our analysis into two parts—irrelevancy of Federal Consent Decree; and lack of inspection—visual or physical.

_____

[13] On appeal, NOPD asserts as its sole assignment of error that CSC abused its discretion by granting Sgt. Morrison's appeal as to Violations 2 to 6 because Sgt. Morrison conducted a strip search and a body cavity search and, thus, committed Violations 2 to 6 by not complying with NOPD's Search and Seizure Policy requirements for such searches.

[14] *See* La. R.S. 1:3 (providing that "[w]ords and phrases shall be read with their context and shall be construed according to the common and approved usage of the language"); La. C.C. Art. 11 (providing that "[t]he words of a law must be given their generally prevailing meaning").

*Irrelevancy of Federal Consent Decree*

Quoting the Federal Consent Decree, NOPD emphasizes that the decree provides that "NOPD agrees to ensure that officers understand how strip and body cavity searches are different than regular searches and are trained on how to conduct proper field strip searches." NOPD's Search and Seizure Policy includes the definitions of strip and body cavity searches as well as the requirements that must be met for those two types of searches. The definitions of strip search and body cavity search in NOPD's Search and Seizure Policy track verbatim the definitions of those terms in the Federal Consent Decree. NOPD contends that, in order to maintain constitutional policing and to ensure compliance with the Federal Consent Decree, it—as the appointing authority and the party accountable to the federal district court under the Federal Consent Decree—must properly and technically construe and apply NOPD's Search and Seizure Policy

This court rejected a similar argument in a pair of companion, recent cases. *Jenkins v. New Orleans Police Dep't*, 22-0031 (La. App. 4 Cir. 6/22/22), ___ So.3d ___, 2022 WL 2237457; *Davis v. New Orleans Police Dep't*, 22-0012 (La. App. 4 Cir. 6/22/22), ___ So.3d ___, 2022 WL 2237458. In both cases, this court observed that NOPD argued its Search and Seizure Policy was enacted in response to the Federal Consent Decree, which required that changes be made to its procedures in order to ensure constitutional policing of New Orleans' citizens. Finding that argument unpersuasive, in both cases we observed that the record was devoid of any evidence that either officer was disciplined for violating the Federal

13

Consent Decree. *Jenkins*, *supra*; *Davis*, *supra*. Likewise, nowhere does the record in this case show that Sgt. Morrison was disciplined for violating the Federal Consent Decree.

NOPD further argues that it is entitled—and obligated under the Consent Decree—to apply and enforce its Search and Seizure Policy as it was deliberately written. NOPD submits that the "[CSC] should [have] give[n] heightened regard to the appointing authorities that serve as special guardians of the public's safety and operate as quasi-military institutions where strict discipline is imperative.'" *Rivet v. Dep't of Police*, 18-0229, p. 8 (La. App. 4 Cir. 10/24/18), 258 So.3d 111, 118 (quoting *Stevens v. Dep't of Police*, 00-1682, p. 8 (La. App. 4 Cir. 5/9/01), 789 So.2d 622, 627). Again, in the pair of recent cases, this court rejected a similar argument, observing:

> This Court observes that "under the arbitrary and capricious standard, the NOPD is entitled to deference in the interpretation of its own rules." *Gant v. New Orleans Police Dep't*, 19-0640, pp. 10-11 (La. App. 4 Cir. 12/4/19), 286 So.3d 524, 532 (citing *Bowers v. Firefighters' Retirement System*, 08-1268, p. 4 (La. 3/17/09), 6 So.3d 173, 176). The NOPD argues, without further explanation, that the CSC erred in substituting its judgment as to the interpretation and application of NOPD's Search and Seizure Policy. However, the NOPD never asserts that the CSC committed any legal error, and it fails to explain with any specificity or record support how it contends that CSC misinterpreted NOPD's Search and Seizure Policy.

*Jenkins*, 22-0031, pp. 10-11, ___ So.3d at ___.[15] The same is true here. Indeed, NOPD concedes, in its appellant brief, that the issue presented here is a mixed question of fact and law to which a manifest error standard of review applies.

---

[15] Identical language appears in the *Davis* case.

NOPD additionally contends that it, as the appointing authority, properly determined that Sgt. Morrison conducted a strip search and a body cavity search in violation of its Search and Seizure Policy. Continuing, NOPD contends that CSC may not merely substitute its judgment for that of the appointing authority. *Whitaker*, 03-0512, p. 5, 863 So.2d at 576 (citing *Chapman v. Dep't of Police*, 97-1384 (La. App. 4 Cir. 1/28/98), 706 So.2d 656). Once again, in the pair of recent cases, we rejected a similar argument, observing: "[c]ontrary to the NOPD's suggestion, we do not find that the CSC ignored any testimony so as to substitute its judgment for that of the appointing authority." *Jenkins*, 22-0031, p. 9, ___ So.3d at ____. In so doing, we also quoted the following observation in *Regis v. Dep't of Police*, 12-1043, p. 6 (La. App. 4 Cir. 12/12/12), 107 So.3d 790, 799:

> [W]e conclude that this is not a case in which the CSC substituted its finding regarding the appropriate discipline for that of the appointing authority. *Fihlman* [*v. New Orleans Police Dep't*], 00-2360, pp. 8-10 [(La. App. 4 Cir. 10/31/01)], 797 So.2d [783,] 788-89). Rather, this is a case in which the NOPD failed to prove to the CSC that it had legal cause to discipline [the officer]. *Id*. The CSC's decision to reverse the discipline imposed on [the officer] thus cannot be viewed as an improper substitution of its judgment for that of the NOPD.

*Jenkins*, 22-0031, p. 9, n. 6, ___ So.3d at ____ (quoting *Regis, supra*).[16] Such is the case here. For these reasons, we find NOPD's arguments regarding the Federal Consent Decree are unpersuasive.

*Lack of Inspection—Visual or Physical*

Both a strip search and a body camera search require an inspection—a visual one for a strip search; a visual one, physical one, or both for a body cavity search. As CSC observed in its decision, the testimony of both Sgt. Morrison and his

---

[16] Identical language appears in the *Davis* case.

15

witness, Officer Williams, supports a finding that neither type inspection occurred or was intended to occur.[17] One of NOPD's witnesses, Captain Hargrove, testified to the contrary that on the BWC Videos he saw a visual or physical inspection. His testimony, however, was based solely on viewing the BWC Videos. But, Sgt. Morrison clarified that Officer Galman's body worn camera, given its placement, would have picked up some visuals no one else would have seen. Sgt. Morrison explained that, due to the officer reaching down into the suspect's clothing, the camera would have picked up a view that no one standing nearby would have seen. Moreover, as Sgt. Morrison emphasized, Officer Galman was not called to testify. Nor was any other witness called to testify and establish that any such visual observation occurred.

This court has previously held that "'deference will be given to the factual conclusions of the Commission.'" *Pope v. New Orleans Police Dep't*, 04-1888, p. 6 (La. App. 4 Cir. 4/20/05), 903 So.2d 1, 4 (quoting *Smith v. New Orleans Police Dep't*, 99-0024, p. 5 (La. App. 4 Cir. 9/22/99), 743 So.2d 834, 837). Sgt. Morrison and Officer Williams were the only witness who were present during the search that testified. We find that CSC's acceptance of the testimony of Sgt. Morrison and Officer Williams to determine that neither a physical nor a visual inspection occurred was not manifestly erroneous. Given the five violations at

---

[17] NOPD contends given this is not a criminal case, CSC erred in focusing on Sgt. Morrison's intent in determining if this case involved a strip search or a body cavity search. We disagree. As Sgt. Morrison points out, Sgt. Morrison's intent to conduct a visual inspection could be an important element in establishing whether a strip or body cavity search occurred.

issue (Violations 2 to 6) hinge on the presence of strip and body cavity searches, we further find CSC's decision to reverse Violations 2 to 6 was not arbitrary.

Our findings are buttressed by the following six factors.

First, a disrobing of the suspect was neither ordered nor occurred.[18] Sgt. Morrison did not order the removal of the suspect's clothing. Nor did he order the pulling down of the suspect's pants. To the contrary, he instructed Officer Galman not to remove the suspect's pants. Revealing undergarments alone in the course of a search does not qualify as a strip search or a body cavity search.[19]

Second, the suspect was wearing multiple pairs of pants; and before Sgt. Morrison arrived, the officers removed the suspect's belt. As the Hearing Examiner observed, "[t]he fact that the suspect's clothing was drooping seemed to be related to the looseness of his clothing and numerous layers of clothes." This fact was unrelated to any attempt to conduct a visual or physical inspection of the suspect.[20]

---

[18] *See* BLACK'S LAW DICTIONARY 1378 (8th ed.2004) (providing that a strip search is defined as "[a] search of a person conducted after that person's clothes have been removed, the purpose usually being to find any contraband the person might be hiding").

[19] *See State v. Hassenbey*, A-1442-16T4, 2018 WL 3190773, at *6 (N.J. Super. Ct. App. Div. June 29, 2018) (observing that the defendant argued that an officer dragging his thumb along the inside of the defendant's pants was a strip search, rejecting that argument, and reasoning that the "[a]lthough [the officer] did lift defendant's shirt, [the officer's] conduct was not for the purpose of visual inspection of defendant's undergarments or private parts").

[20] *See United States v. Burnett*, 09-4003-04CR-C-NKL, 2009 WL 2835751, at *4 (W.D. Mo. Aug. 31, 2009) (observing that "[t]he search was not a strip search" and that defendant's "pants were extremely baggy and removed very easily; he was wearing boxer shorts underneath his jeans which were already exposed under his baggy pants, and at no point was [defendant] nude"); *Jenkins v. State*, 978 So.2d 116, 118 (Fla. 2008) (observing that "Jenkins was wearing baggy blue jeans with a low-hanging waist, and this allowed Bonollo to see that Jenkins was wearing boxer type shorts as an undergarment").

Third, shaking a suspect's clothing is neither a visual nor a physical inspection. [21] Sgt. Morrison's intent, as both Sgt. Morrison and Officer Williams testified, was simply to have Officer Galman shake the suspect's clothing.

Fourth, the BWC Videos reflect that Officer Galman put on rubber gloves before reaching into the suspects pants to attempt to grab the object. NOPD suggests that Officer Galman put on rubber gloves because he was preparing to perform a body cavity search. But, as the Hearing Examiner observed, "[i]t seems hygienic to put on a glove if your hand might be near someone's naked body. Thus, this point seems irrelevant this is a red herring." We agree.

Fifth, the search was brief in duration and scope. Sgt. Morrison testified that the reach-in to "grab it" search lasted a total of seven seconds; and both Officer Williams and Sgt. Morrison testified that they never saw the suspect's buttocks. At best, NOPD established that Officer Galman's body worn camera captured less than a seven-second glimpse at that body part. Again, as Sgt. Morrison clarified, Officer Galman's body worn camera would have picked up some visuals because the officer wearing it was reaching down into the suspect's clothes. NOPD, however, failed to establish that anyone standing nearby saw that body part. As CSC observed, both Officer Williams and Sgt. Morrison denied seeing that body part. Neither Officer Galman nor any other witness who was present at the scene was called to testify to the contrary.[22]

---

[21] *See State v. Evans*, 386 Wis.2d 628; 927 N.W.2d 920 (Ct. App.2019) (observing that after the officers felt something during the pat-down they believed was drugs, "they certainly could then follow through and shake the defendant's pants to see if the drugs would fall out").

[22] *See State v. Evans*, 386 Wis.2d 628; 927 N.W.2d 920 (Ct. App.2019) (observing that "no witness testified that any part of Evans' body was uncovered during the search").

Sixth, and finally, the jurisprudence has recognized another type of search labelled a "reach-in" search, which is defined as "a manipulation of the arrestee's clothes such that the police are able to reach in and retrieve the contraband without exposing the arrestee's private areas." *Paulino v. State*, 399 Md. 341, 360, n. 6; 924 A.2d 308, 319 (2007); 79 A.L.R.6th 631 (originally published in 2012).[23] On a continuum, the search of the suspect here falls closer to a reach-in search than either a strip search or a body cavity search.

Summarizing, both a strip search and a body camera search require an inspection—a visual one, for a strip search; a visual one, physical one, or both for a body cavity search. CSC's decision turns on its factual assessment that neither type of inspection occurred or was intended to occur. Based on that finding, CSC reasonably concluded that although a search was conducted—under Sgt. Morrison's supervision and instruction—that search did not fall within NOPD's Search and Seizure Policy definition of the terms strip search or body cavity search. Rather, it was some other type of search, such as a reach-in search. For this reason, CSC correctly concluded that Violations 2 to 6 were improperly sustained. CSC's decision reversing Sgt. Morrison's suspension as to Violations 2 to 6, thus, was not arbitrary.

---

[23] *See Cotto v. City of Middletown*, 158 F.Supp.3d 67, 79, n. 5 (D. Conn.2016) (collecting cases and observing that nearly all the cases in which searches have been classified as "pull out and reach in" have involved "an officer reaching into a subject's clothing only after independently determining that there was a foreign object in the subject's private area"); *Meeks v. City of Minneapolis*, 822 F.Supp.2d 919, 923 (D. Minn. 2011) (observing that "[a] public strip search of a suspect is more invasive than a 'reach-in' search performed when an officer reaches into a suspect's pants without disrobing him to retrieve a hidden item from the area surrounding the suspect's buttocks or genitals").

**<u>DECREE</u>**

For the foregoing reasons, we affirm the judgment of the Civil Service Commission of the City of New Orleans ordering the Appointing Authority, the New Orleans Police Department, to correct Sergeant Morrison's personnel record to reflect a one-day—instead of a six-day—suspension and to reimburse him back pay and other emoluments of employment for five of the six days that he was suspended.

**AFFIRMED**